**MARCIA V., Appellant,**

v.

**STATE of Alaska, Office of Children's Services, Appellee.**

**No. S–13065.**

Supreme Court of Alaska.

Jan. 21, 2009.

---

G. Blair McCune, Anchorage, for Appellant.

Laura C. Bottger, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Leslie N. Dickson, Assistant Public Advocate, and Rachel Levitt, Public Advocate, Anchorage, Guardian Ad Litem.

Before: FABE, Chief Justice,
EASTAUGH, CARPENETI, and
WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A mother appeals the termination of parental rights to her daughter, an Indian child for purposes of the Indian Child Welfare Act (ICWA). The ICWA standard for termination is "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[1] The mother argues that the trial court erred (1) in considering the expert's qualifications as sufficient to meet the requirements of ICWA; and (2) in finding that the evidence presented at trial

was sufficient to prove beyond a reasonable doubt the likelihood of serious emotional or physical damage to the child. Because the trial court's reliance on the expert witness, which was first raised on appeal, did not constitute plain error, and because the court did not err in concluding that the state met its burden of proof, we affirm.

## II. FACTS AND PROCEEDINGS

This case concerns termination of the parental rights of Marcia to her daughter Alice.[2] Alice was born in 1997. Marcia and Alice are Alaska Natives from the Native Village of Barrow. Alice is an Indian child within the meaning of ICWA.

Marcia and Alice have a history with the Alaska Department of Health and Social Services, Office of Children's Services (OCS), and with tribal child protective services dating back to a substantiated report of neglect in 1999. In 2003 the Native Village of Barrow took care of Alice while Marcia was in jail in Nome for an assault charge. In 2004 Marcia violated probation by testing positive for cocaine and being under the influence of alcohol.

Marcia and Alice later moved to Anchorage where they lived with relatives. In March 2006 OCS investigated a report that Alice was no longer attending elementary school. The school had contacted the family with whom Marcia and Alice were living and learned that Marcia had been told to leave the home due to her use of alcohol and drugs and her failure to contribute financially.

An OCS social worker found Marcia and Alice staying with Marcia's aunt, and learned that two other occupants of that home, Marcia's cousin and uncle, were convicted sex offenders. Marcia sometimes left Alice in their care to visit her boyfriend. OCS claims that Marcia did not seem to recognize the danger this posed to her daughter, and arranged for Marcia and Alice to stay at a shelter. Alice was interviewed at the shelter regarding sexual abuse, but did not report any such abuse having occurred.

---

1. 25 U.S.C. § 1912(f) (West 2008).

2. We use pseudonyms to protect the identities of the family members.

During April 2006 the shelter asked Marcia and Alice to spend a night away from the shelter while repairs were done. Marcia sought additional time away from the shelter after she was told she could return, and the shelter denied this request. As a result, she was discharged from the shelter for failure to obey curfew.

OCS took custody of Alice later in April 2006 after Marcia left Alice with a friend to look after her, did not return when expected, and could not be located. Marcia said she left Alice with the friend because she needed to find a new place to live, and that the friend had a "change of heart" and took Alice to OCS after she could not get in touch with Marcia. OCS has a different version of these events, stating that Marcia told the friend she would be gone a few hours, then disappeared for days before the friend brought Alice to OCS. OCS considered this abandonment and sought to take emergency custody of Alice on April 18, 2006.

Alice's school reported to OCS that while she was in Marcia's care, Alice had been frequently absent from school, sometimes for as long as a week, and that she had fallen significantly behind in her school work. Marcia told a social worker that these absences from school were because they had no fixed address and "moved around a lot between friends." After Alice entered foster care, her foster parent told social workers that Alice would wake up screaming if she was left alone while sleeping. The foster parent also reported to OCS that Alice was "hyper" and had trouble focusing. Anchorage Community Mental Health Services diagnosed Alice with acute post-traumatic stress disorder and she entered weekly therapy. The therapy helped her make significant progress with her school performance and anxiety.

Marcia consistently stated that she loved her daughter and wanted to have custody of her. Alice similarly told social workers that she loved her mother, and the social workers observed a noticeable bond between them. Marcia understood that she needed treatment for her substance abuse problems. OCS developed a case plan that required her to attend AA meetings, comply with a substance abuse assessment, and obtain stable employment and housing.

OCS viewed treating Marcia's alcoholism as the first priority of her OCS case plan. Marcia was drinking heavily and sometimes became violent and had memory lapses when intoxicated. She reported that she drank on weekends, but that weekends began on Thursday, and she would consume at least a twelve-pack of beer on each occasion she drank. Her June 2006 substance abuse assessment recommended intensive outpatient treatment. Her case plan called for her to complete twenty-four weeks of intensive outpatient treatment. Marcia was referred to an outpatient treatment program but missed several intake appointments and did not follow through on it. She acknowledged her need for treatment but said she was not strong enough for outpatient treatment and wanted to enter an inpatient program. She declined to enter two suggested inpatient programs because they would not allow her daughter to join her. Eventually Marcia did enter a thirty-six-day treatment program for alcohol abuse in Sitka. She attended thirty-five days of the program, and made some progress there, attending classes and meetings for alcohol abuse and anger management, and completing homework assignments. However, she was discharged in October 2007 without completing the program due to non-compliance with rules and threatening behavior toward staff and peers.

After Alice entered foster care in April 2006, Marcia's visitation with her daughter was "very sporadic," according to her OCS social worker. There were gaps of up to four weeks or more when she did not visit. She was often difficult to contact due to her lack of a permanent address. In September 2006 OCS asked her to sign a visitation contract due to her record of being late or not showing up for scheduled visitation appointments. In late 2006 she told her social worker she had just spent a month in jail on assault charges. OCS informed her that she needed to work on completing tasks in her case plan and become engaged; OCS also informed her that if Alice remained in foster care as of

April 2007, OCS would be required to petition to terminate Marcia's parental rights.

Additional factors besides alcoholism likely contributed to Marcia's lack of success in following her case plan. She has been diagnosed with severe post-traumatic stress disorder. She reported that she had been sexually abused by her father, as a result of which she herself as a child had been declared a child in need of aid. She had also witnessed her own mother commit suicide. As an adult, Marcia was a victim of domestic violence. She told OCS that she had recently escaped from a very abusive relationship with a man who beat her and would not let her leave or use the telephone. She once showed up in the OCS office visibly bruised from a beating. The OCS social worker offered to call the police or help her get into a shelter because of this abuse, but she declined. A further challenge was her lack of a stable residence. Because she moved from place to place so much, it was difficult for OCS to stay in contact with her.

Around the end of 2006, Marcia told OCS she wanted to move back to Barrow, and to have Alice moved to a foster home there. OCS eventually placed Alice in a new foster home in Barrow. Marcia moved back to Barrow where she lived with her father and began visiting her daughter. However, Marcia's substance abuse and erratic behavior also continued in Barrow. She was arrested for assaulting and injuring her father in March 2007, and in another incident in April 2007 she was medivaced from Barrow to Anchorage for medical treatment, where she tested positive for alcohol and methamphetamines. She reported that she was using methamphetamines and drinking a bottle of hard liquor every other day. In May 2007 she spent twenty days in jail for probation violations.

In Barrow Marcia also alarmed Alice's foster family and the social worker by taking Alice without permission to visit with Marcia's father. Because Marcia had reported past sexual abuse by her father, her social worker strongly warned her not to do this again.

On November 14, 2006, Alice was adjudicated a child in need of aid, and on April 11, 2007, the superior court committed her to OCS custody for up to two years. In July 2007 OCS petitioned for termination of Marcia's parental rights.

At the termination trial in January 2008, Alice's father voluntarily relinquished his parental rights.[3] Marcia received notice of the trial, but she did not attend it. Before trial, Alice had told a social worker that she wanted to return to her mother, but also accepted the possibility she might be adopted by the foster family with whom she was living.

The trial court heard testimony from two witnesses who worked as social workers on Marcia's case. Kimberly Goines was the social worker who handled Marcia's case from around June 2006 through April 2007. She testified that Marcia did not comply with her case plan for treatment of her substance abuse problems. She also testified that Marcia's care placed Alice at risk because of the lack of a stable home, exposure to sex offenders, and domestic violence from Marcia's boyfriends. A second social worker, Michelle Virden, who succeeded Goines on the case, provided similar evidence. Virden also noted that, to her knowledge, Marcia had not completed any elements of her case plan. The court admitted into evidence Marcia's OCS case plans, records, and correspondence from the family's treatment and service providers, and some of her past court records.

The court also took expert testimony from Tricia Tank, an OCS supervisor. The court qualified Tank as an expert witness—on the question of the impact of substance abuse on the care and abandonment of a child—without objection. Her testimony was based on a review of Marcia's case file, the trial exhibits, police reports, and other records, as well as speaking to OCS social worker Virden and Virden's supervisor. Tank concluded that Marcia had not remedied the problems that brought Alice into state custody, and that she

---

3. The role of Alice's father in her upbringing is not entirely clear from the record, but it was quite limited. In June 2006 he met with a social worker and discussed his obstacles to successful parenting: substance abuse, lack of housing and domestic violence issues. There is no indication that he ever visited Alice while she was in foster care.

could not maintain a sober lifestyle or provide a safe home and adequate care for Alice. She testified that Marcia's substance abuse had caused her bond and attachment with Alice to deteriorate: "[A] child of [Alice's] age needs a stable, healthy parent to care for her. She needs to have her basic needs met by her mother, her basic clothing, food, shelter, educational, medical care . . . and it does not appear as though [Marcia] has been able to do that for her." As a result, she said, Alice was at risk of developing an attachment disorder. She pointed in particular to Marcia's inability to stay sober, her exposure of Alice to "unhealthy people," her sporadic visitation of Alice in foster care, and her inability to make arrangements for Alice's care while incarcerated. She said normally a parent would need to demonstrate at least six months sobriety before reunification would be allowed, but the need to provide Alice with a stable home precluded waiting any longer to see if Marcia could eventually achieve this.

Tank concluded that Alice was "in substantial risk of . . . emotional and physical neglect if she were in the care of [Marcia]." She later characterized this as a "serious risk" of emotional and physical neglect.

On February 6, 2008, the court found there was evidence beyond a reasonable doubt that Marcia's custody of Alice was likely to result in serious emotional and physical damage to the child, and terminated Marcia's parental rights.

## III. STANDARD OF REVIEW

In a child in need of aid case, we will sustain the trial court's factual findings unless they are clearly erroneous.[4] Factual findings are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party leaves us with a definite and firm conviction that a mistake has been made.[5] Thus, "we will ordinarily not overturn a superior court's findings based on conflicting evidence."[6] We review a trial court's application of law to factual findings *de novo*.[7]

The question of whether an expert's testimony presented at trial is sufficient pursuant to ICWA is a legal question, which we review *de novo*.[8]

We review issues not raised at trial only for plain error.[9] Plain error exists "where an obvious mistake has been made which creates a high likelihood that injustice has resulted."[10]

## IV. DISCUSSION

The decision to terminate parental rights in this case is governed by both state and federal statutes. Alaska law requires that the superior court find by clear and convincing evidence that (1) the child is in need of aid as defined in AS 47.10.011;[11] (2) the parent has not remedied the circumstances that put the child in need of aid, or made sufficient progress in doing so;[12] and (3) the state made reasonable efforts to support reunification of the family.[13] In making these findings, the court can also consider any factor that relates to the best interests of the child.[14]

In addition to the state requirements, federal law requires additional showings for termination of parental rights with respect to children determined to be Indian children within the meaning of ICWA.[15] The party

---

4. *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527, 529 (Alaska 2004).

5. *Id.*

6. *Id.*

7. *Id.*

8. *E.A. v. State*, 46 P.3d 986, 989 (Alaska 2002).

9. *In re Adoption of L.E.K.M.*, 70 P.3d 1097, 1100 (Alaska 2003).

10. *Miller v. Sears*, 636 P.2d 1183, 1189 (Alaska 1981).

11. AS 47.10.088(a)(1)(A).

12. AS 47.10.088(a)(1)(B).

13. AS 47.10.088(a)(3), 47.10.086.

14. AS 47.10.088(b).

15. "Indian child" is defined at 25 U.S.C. § 1903(4) (West 2008).

seeking to terminate parental rights must show by clear and convincing evidence that active efforts have been made to keep the family together and that those efforts have proved unsuccessful.[16] ICWA § 1912(f) requires that a court find "beyond a reasonable doubt, based on evidence that includes testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[17] Such a finding requires proof both that the parent's conduct is likely to harm the child, and proof that it is unlikely the parent will change her conduct.[18]

It is on the basis of ICWA § 1912(f) that Marcia appeals. She makes two arguments. First, she argues that the trial court erred by relying on an expert whose qualifications were insufficient under ICWA § 1912(f). Second, she asserts for a variety of reasons that the evidence as a whole does not support beyond a reasonable doubt the likelihood of serious emotional or physical damage to Alice.

### A. The Trial Court Did Not Commit Plain Error by Treating the Expert Witness as Sufficiently Qualified Under ICWA Standards.

Marcia argues that there are "glaring deficiencies in the qualifications" of the expert witness Tricia Tank with respect to the expert witness requirement of ICWA § 1912(f) because: (1) Tank lacked expertise in Native culture; and (2) Tank lacked sufficient education, training, and experience. We conclude that the first of these claims lacks any merit, because expertise in Native culture is not required in a termination case of this kind. The second claim has some support in ICWA guidelines and legislative history, but Marcia made no objection to the expert's qualifications at trial, and the argument for error is not strong enough to reverse or

remand under a plain error standard of review.

### 1. The trial court did not err in relying on the testimony of an expert who lacked familiarity with Native culture.

In *L.G. v. State*,[19] we noted that ICWA does not require testimony from an expert in Native culture to terminate parental rights when there is "clear evidence of physical neglect...."[20] Marcia acknowledges this, but argues that the lack of such expertise is nevertheless a deficiency that the expert must overcome with particularly clear and compelling testimony: "Tank was not qualified to give opinions concerning [N]ative children and certainly did not testify to such a clear likelihood of serious emotional or physical damage *that expertise in [N]ative culture could be dispensed with."* (Emphasis added.)

 When the basis for termination is unrelated to Native culture and society and when any lack of familiarity with cultural mores will not influence the termination decision or implicate cultural bias in the termination proceeding, the qualifications of an expert testifying under § 1912(f) need not include familiarity with Native culture.[21] The termination order by the trial court relied on evidence of Marcia's addictions, violent behavior, incarceration, inability to provide a stable home, neglect, exposure of Alice to sex offenders, domestic violence in the home, and abandonment of Alice. Nothing in the trial record or in Marcia's appeal suggests that cultural bias might have been at issue, or that considering the appropriate tribal standards of child care would affect the disposition of the case. Thus, Tank's lack of familiarity with Native culture cannot be considered a deficiency in her qualifications to testify under ICWA § 1912(f).

**16.** 25 U.S.C. § 1912(d); *see* AS 47.10.088(a)(3); AS 47.10.086.

**17.** 25 U.S.C. § 1912(f); *see also* Child in Need of Aid (CINA) Rule 18(c)(2)(4).

**18.** *L.G. v. State, Dep't of Health & Soc. Servs.,* 14 P.3d 946, 950 (Alaska 2000).

**19.** *Id.*

**20.** *Id.* at 952.

**21.** *Id.* at 952–53.

2. **The trial court did not commit plain error with regard to the qualifications of an expert witness under ICWA § 1912(f).**

▐█ Marcia attacks Tank's education and experience, arguing that the trial court erred as a matter of law in relying on her testimony to satisfy the requirements of ICWA § 1912(f). Marcia concedes that she did not raise this issue at trial, meaning that it must be reviewed under a plain error standard of review. The legislative history of and federal guidelines for ICWA provide some support for the argument that a clearer foundation should have been laid at trial for this expert's qualifications in relation to the purposes of ICWA. However, we conclude that if there was any error here, it cannot be considered reversible error under the plain error standard of review.

▐█ ICWA § 1912(f) heightens the requirements for an expert's qualifications beyond those normally required to qualify an expert. In *L.G. v. State*, we noted that Congress intended ICWA to prevent Native children from being separated from their families solely on the basis of testimony from social workers who were unable to "distinguish between cultural variations in childrearing practices and actual abuse or neglect." [22] Federal ICWA guidelines describe the three types of experts that are "most likely" to meet ICWA's requirements: (1) a member of the child's tribe recognized by the tribal community as knowledgeable in tribal customs pertaining to family organization and childrearing practices, (2) a lay expert with substantial experience and knowledge regarding relevant Indian social and cultural standards and childrearing practices and the delivery of child and family services to Indians, or (3) "*[a] professional person having substantial education in the area of his or her specialty.*" [23] There is no indica-

tion Tank could have been qualified under the first two subparts, so under these guidelines she would have had to qualify by virtue of substantial education in the area of her specialty. The legislative history of ICWA provides further guidance, stating that the education and training of the expert should constitute "expertise beyond the normal social worker qualifications." [24]

The legislative history and ICWA guidelines are not regulations and are not binding. But in the past we have turned to the ICWA guidelines and legislative history for guidance in interpreting the expert witness requirement of ICWA, and made clear that more is required of an ICWA expert than simply being "qualified" as some kind of expert under the rules of evidence.[25]

To discuss Tank's level of education and expertise in her area of specialty requires clarifying what kind of expertise the trial court determined her to possess. The OCS's attorney moved to qualify her as a witness on "child welfare." After voir dire, the judge told the witness that he understood her testimony would concern whether continued custody of the child in this case by the parent was likely to result in serious emotional or physical damage to the child (i.e., the finding required by § 1912(f)). After further discussion, the attorneys agreed that, while Tank would not be qualified as an expert on alcoholism, she would testify as to "how the substance abuse is impacting the abandonment and care of the child...." After further discussion, the judge stated, "All right. I'll qualify her as an expert for the reasons stated." The judge's remarks make clear that he viewed Tank as an expert with respect to the required findings of ICWA § 1912(f). It is also clear that the attorneys for the parties agreed Tank was an expert

---

**22.** *Id.*

**23.** Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,593 (1979), *quoted in In re Termination of the Parental Rights of T.O.*, 759 P.2d 1308, 1309 n. 3 (Alaska 1988) (emphasis added).

**24.** H.R.Rep. No. 95–1386, at 22 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7545; *see,*

*e.g., Matter of Adoption of H.M.O.*, 289 Mont. 509, 962 P.2d 1191, 1197 (1998); *In re M.J.J.*, 69 P.3d 1226 (Okla.Civ.App.2003); *In re Dependency of Roberts*, 46 Wash.App. 748, 732 P.2d 528 (1987).

**25.** *See, e.g., L.G.*, 14 P.3d at 952–53; *In re Termination of Parental Rights of T.O.*, 759 P.2d at 1309.

with respect to the effects of parental substance abuse on the welfare of a child.

Tank holds a bachelor of science degree in Administration of Justice. At the time of trial she had about seven years of OCS experience. She had been an OCS permanency supervisor for three years, during which time she had supervisory responsibility over six line staff working on ninety-six cases at a time. Prior to that she had been a "team decision making facilitator" for just under a year, and a permanency line worker for three and a half years. As a line worker she had been responsible for about twenty-one cases at any given time. She had testified as an expert witness in four previous child welfare cases involving issues of substance abuse, abandonment, and the likelihood of serious emotional or physical damage to a child. Her resume lists thirteen trainings in various areas of child protection she received between 2001 and 2006, in subjects including effects of abuse and neglect on children, placement and reunification, sexual abuse interviewing, and risk assessment.

Based on these qualifications, we conclude that the court did not abuse its discretion in qualifying Tank as an expert on child welfare. As a line worker and supervisor, Tank has been involved in many dozens, probably hundreds, of child welfare cases. She has received numerous specialized trainings in addition to her undergraduate degree in administration of justice.

However, it requires further inferences to conclude that Tank has expertise beyond that of a normal social worker, or that she has substantial education regarding the effects of parental substance abuse on children. Such inferences may be reasonable, in that it is quite possible that Tank's experience and training as a social worker and supervisor give her these heightened qualifications. But it is not obvious that counsel for OCS laid a sufficient foundation. Ideally counsel would have inquired more deeply into the specialized areas in which Tank was claimed to be expert, particularly the effects of pa-

rental substance abuse on children. The record does not unambiguously reflect a foundation for Tank having the "expertise beyond the normal social worker qualifications" that ICWA legislative history indicates was intended by the law, nor the "substantial education in the area of his or her specialty" recommended by the ICWA guidelines.

The state argues that "this court has relied on expert testimony presented by OCS social workers in other reported cases." However, in the two cases cited by the state, the sufficiency of the social worker's qualifications under ICWA does not appear to have been at issue.[26] Furthermore, in both cases the testimony of the social worker was supported by additional testimony from a psychologist.[27] In any case, the question is not whether a social worker *could* be a qualified expert under ICWA, but what level of education and expertise is necessary for a social worker to satisfy ICWA's legal requirements.

We conclude, however, that we need not plumb further the question whether Tank had expertise beyond that of a normal social worker, because Marcia abandoned the issue at trial. After voir dire of the witness, Marcia's counsel indicated no objection to her testifying as an ICWA expert: "Your honor, for purposes of Ms. Tank, I'm not going to object to her qualification as an expert as to this case.... If it's in terms of talking about how the substance abuse is impacting the abandonment and care of the child, I have no objection." Because it was possible to infer from Tank's known qualifications that she possessed the qualifications necessary under ICWA, it was not plain error for the trial court to accept Marcia's acquiescence. The "high likelihood of injustice" required to reverse under the plain error standard of review is not present here.

**B. Substantial Evidence Supports the Trial Court's Finding that the State Met Its Burden of Proof Regarding the Likelihood of Serious Emotional or Physical Damage to the Child.**

■ Marcia argues that the evidence at trial was insufficient to support the court's

26. *See L.G.*, 14 P.3d at 951, 953; *E.M. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 959 P.2d 766, 769–70 (Alaska 1998).

27. *See L.G.*, 14 P.3d at 951; *E.M.*, 959 P.2d at 769–70.

finding, as required by ICWA § 1912(f), of "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[28] The trial court concluded that it had heard evidence meeting this standard.

Marcia claims the court erred in reaching this conclusion for a variety of reasons. Among them are the qualifications of the expert, discussed above. In addition, she argues the judge erred with respect to (1) findings of fact about the risk to Alice of sexual abuse, (2) findings of fact about emotional problems already experienced by Alice, (3) reliance on testimony of an expert who did not speak to key witnesses, and (4) reliance on an expert whose conclusions were couched in language that differed from the findings required by ICWA § 1912(f). We conclude that none of these arguments has merit, and that the trial court did not err in concluding that the state met the burden of proof required by ICWA § 1912(f).

### 1. The trial court did not err in its findings of fact about the risk of sexual abuse.

Marcia is "especially concerned about the court's finding that she left Alice with 'sexual perpetrators.'" Marcia does not dispute that Marcia and Alice lived with a cousin and uncle who were convicted sex offenders and was sometimes left in their care. Nor does she dispute that she brought Alice along to visit Marcia's father in Barrow, despite the fact that her father had in the past sexually abused her.

It was not error for the trial court to view this evidence as supporting its ultimate finding of a likelihood of serious emotional or physical damage. The fact that Marcia and Alice were living with convicted sex offenders (the uncle and cousin) and that Marcia sometimes left Alice alone with them worried OCS social workers sufficiently that OCS immediately sought to place Marcia and Alice in a shelter and have Alice screened for possible sexual abuse. OCS also found troubling the fact that Marcia did not express to social

workers any recognition that "convicted sex offenders posed a significant safety risk to her young daughter." Given that OCS viewed these contacts as a "significant safety risk," a claim not rebutted by Marcia, it was not error for the court to interpret that evidence in a similar fashion.

In the same vein, Marcia's taking Alice to visit Marcia's father, who had sexually abused Marcia as a child, could properly be considered by the superior court in weighing the risk of sexual abuse of Alice if left in her mother's custody.

Thus, the trial court did not clearly err in finding that Marcia placed Alice at risk by exposing her to sex offenders. Marcia does not dispute that she left Alice in the care of sex offenders in Anchorage. Regarding Marcia's father in Barrow, the superior court could properly consider even a single visit to him to be evidence that the mother exposed Alice to risky contact with sex offenders. OCS supervisor Tricia Tank, the expert witness, testified that Marcia's taking Alice to visit Marcia's father was "very dangerous."

In conclusion, the superior court did not err in considering the facts concerning exposure to sexual perpetrators as evidence of a risk of emotional or physical damage, nor in the weight it placed upon this evidence.

### 2. The trial court did not err in its findings of fact about emotional harm to the child.

Marcia expresses her concern "about testimony regarding Alice's difficulties" such as nightmares and adjustment problems when initially placed in foster care. Marcia notes that subsequent therapy helped alleviate these emotional problems. This falls far short of establishing any error by the trial court. The record is replete with descriptions of actual and potential emotional harm caused by Alice's unstable home life, and by her mother's substance abuse and neglect. As the expert witness testified and as the judge concluded, these facts tended to show the harmful effects of Marcia's conduct on the child. The question of whether returning

---

**28.** 25 U.S.C. § 1912(f) (West 2008).

the child to Marcia's care would likely harm the child turns on the nature of Marcia's conduct and whether she has made enough progress in changing her problematic behavior, not the extent to which the emotional damage such behavior causes can be mitigated by therapy.

### 3. The trial court did not err in relying on the testimony of an expert who did not interview the mother, daughter, or non-OCS service providers.

Marcia argues that Tank's testimony is undermined by "weaknesses" such as basing her testimony "principally on a review of the OCS file" and not speaking to Marcia, Alice, or any non-OCS treatment providers. The question of whether an expert's testimony presented at trial is sufficient pursuant to ICWA is a legal question that we review *de novo*.[29]

We have held that pretrial interviews by the expert with the parties in a termination case "are not required in every case."[30] A review of state records and summaries of relevant facts can be enough if they "keep the experts' testimony sufficiently grounded in the facts and issues of the case."[31] However, we have also acknowledged that an expert's exclusive reliance on the case file without speaking to the parent or child may weaken the testimony.[32]

This case differs significantly from other cases in which over-reliance on documents fatally weakened the expert's testimony. For example, in *C.J. v. State*,[33] the expert's testimony was weakened because the expert never spoke with the father.[34] However, that omission was part of a broader failure of the expert to ground himself in the particulars of the case. As a result, his testimony provided "little more than generalizations about the harms resulting from a parent's absence and ... little discussion of the particular facts of this case."[35] The expert also failed to address key facts about how the father had taken major steps to redress problems in his suitability as a parent such as finding new employment.[36] In *J.J. v. State*, an expert's testimony was similarly held to be weakened by the expert's reliance on the case file without interviewing the parent or children.[37] Like the expert in *C.J.*, that expert's lack of preparation resulted in testimony that was little more than generalizations and that missed key facts about the parent's progress in meeting case plan requirements.[38]

In the present case, there is no indication that Tank missed any important facts regarding Marcia's suitability as a parent. Tank read the case file, including all of the exhibits, as well as case notes, assessments, police reports, and other records that were not submitted as exhibits. She also spoke with Marcia's social worker and that social worker's supervisor. In her testimony, Tank touched on many specifics of the case. These included Marcia's drinking problem and inability to remain sober, her failure to make significant progress on treating that problem, her sporadic visitation of her daughter, her inability to provide a stable home and maintain a healthy relationship with Alice, Alice's resulting emotional difficulties, Marcia's exposing Alice to sex offenders, Marcia's repeated incarcerations, and Alice's problems in school while in Marcia's care.

In conclusion, Tank's testimony was sufficiently grounded in the facts and specifics of this case, and there is no indication that the failure to interview the mother, daughter, or

---

**29.** *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002).

**30.** *See J.A. v. State, DFYS*, 50 P.3d 395, 400 (Alaska 2002).

**31.** *Id.*

**32.** *See J.J. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 38 P.3d 7, 10 (Alaska 2001).

**33.** *C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214 (Alaska 2001).

**34.** *Id.* at 1218.

**35.** *Id.*

**36.** *Id.* at 1219.

**37.** 38 P.3d at 10.

**38.** *Id.* at 10–11.

**508**

other service providers undermined the validity of her conclusions. There was no error in the court's reliance on such testimony to meet the proof requirements of ICWA § 1912(f).

**4. The trial court did not err in relying on expert testimony that couched its conclusions in different language than that required for the ICWA § 1912(f) findings.**

Marcia argues Tank's testimony is "deficient" because she did not specifically state her conclusions regarding risk to the child in the same language used in ICWA § 1912(f). We review this issue *de novo* since it goes to whether the expert's testimony presented at trial is sufficient pursuant to ICWA.[39]

■ The statute requires that the court terminating parental rights must make "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[40] Tank testified that placing Alice in Marcia's care would put her at "substantial risk" of "emotional and physical neglect." She later characterized this as a "serious risk." She also noted that Alice was at risk of developing an attachment disorder.

Marcia argues that "Tank's failure to actually state that return of Alice to Marcia was 'likely' to result in 'serious emotional or physical damage' presents a critical deficiency in the State's case and the termination order which resulted from it." This is a misinterpretation of what the statute requires. The findings of a likelihood of serious emotional or physical damage are findings that must be made by the trial judge, not the expert witness. The expert testimony constitutes some of the evidence upon which the judge bases this finding. But it does not need to be the sole basis for that finding; it simply must support it.[41] Nothing about the way Tank's

conclusions were stated suggests that the judge erred in relying on this testimony to make the findings mandated by § 1912(f).

**5. Substantial evidence supports the trial court's ruling.**

Substantial evidence in the record supports the court's conclusion that the state had proven beyond a reasonable doubt that returning Alice to Marcia's care was likely to cause serious emotional or physical damage to her. Most of the facts that the court based this conclusion on—including Marcia's alcoholism, neglect of Alice, repeated incarcerations, and failure to comply with her case plan—were not disputed.

**V. CONCLUSION**

Because the superior court did not commit plain error in treating the expert witness as qualified under ICWA, and because substantial evidence supports the superior court's finding that returning Alice to Marcia was likely to result in serious emotional or physical damage to the child, we AFFIRM the decision of the superior court terminating Marcia's parental rights.

MATTHEWS, Justice, not participating.

**39.** *E.A. v. State, Div. of Family & Youth Servs.,* 46 P.3d 986, 989 (Alaska 2002).

**40.** 25 U.S.C. § 1912(f); *see also* CINA Rule 18(c)(2)(4).

**41.** *See E.A.,* 46 P.3d at 992.