NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| PARKER M., | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF ALASKA, | ) |
| DEPARTMENT OF HEALTH & | ) |
| SOCIAL SERVICES, OFFICE OF | ) |
| CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |
| | ) |
| CRISTI M., | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF ALASKA, | ) |
| DEPARTMENT OF HEALTH & | ) |
| SOCIAL SERVICES, OFFICE OF | ) |
| CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Supreme Court Nos. S-16293/16297
(Consolidated)

Superior Court Nos. 3AN-12-00350/
00351 CN

MEMORANDUM OPINION
    AND JUDGMENT*

No. 1632 – June 7, 2017

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Pamela Scott Washington, Judge pro tem.

*        Entered under Alaska Appellate Rule 214.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant Parker M. Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Cristi M. John M. Ptacin, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I.    INTRODUCTION

A father and mother challenge the termination of their parental rights to two Indian children. The superior court found that the children were in need of aid based on the parents' substantial impairment due to alcohol use. Both parents challenge the court's active efforts finding, and the father challenges the qualifications of the expert witness who supported the finding that continued custody would result in serious harm to the children. Because the Office of Children's Services (OCS) made active efforts in this case and the expert was properly qualified under the Indian Child Welfare Act (ICWA), we affirm the superior court's decision.

## II.    FACTS AND PROCEEDINGS

### A.    Background

Parker and Cristi M. are the parents of Jessa (14 years old), Judah (8 years old), and two adult children.[1] Parker is a member of the Orutsararmiut Native Council and was raised in Bethel; Jessa and Judah are also eligible for membership in the Council and are therefore "Indian children" under ICWA.[2] Cristi was raised by her grandparents in Pilot Station, a traditional Yup'ik village in the Yukon-Kuskokwim Delta. The couple

---

[1]    We use pseudonyms to protect the privacy of the parties.

[2]    *See* 25 U.S.C. § 1903(4) (2012).

met and lived together in Bethel before moving to Anchorage. Both the Council and Pilot Station Traditional Village were notified of the proceeding, and the Council intervened.

Parker and Cristi have struggled with alcohol for most of their lives. Both parents began drinking when they were 17, and they have tried to achieve long-term sobriety numerous times over the intervening 30 years. Both parents also admit to having drinking problems that affect the parenting of their children.

**B.     Initial OCS Involvement And Failed Trial Home Visit**

The family has been involved with OCS since 2000. The current proceeding began in October 2012 when OCS assumed temporary custody of the children due to alleged neglect and domestic violence based on the parents' drinking. OCS's primary concern was that the parents "would drink excessively, become very violent with one another and neglect the needs of their children." OCS was also concerned about the children's "pretty significant special needs" and whether the parents understood or could provide for those needs. Both children suffer from cognitive delays, anxiety, and possible fetal alcohol spectrum disorder. Jessa receives special services at Hope Community Resources, an organization which "tailors towards children that are considered low functioning [or] have developmental delays," and she sees an individual therapist for one-on-one life skills support. For a while Judah received services for post-traumatic stress disorder (PTSD) and anxiety; as of the March 2016 termination trial, he was engaging in self-harm through scratching, and his services consisted of an assessment at Hope and what his foster parent called "a couple of pull outs" at school.

During the first year and a half of this case, the parents completed substance abuse treatment, worked with Cook Inlet Tribal Council (CITC) — which provides services to Alaska Native families in southcentral Alaska — for case management support, completed parenting classes, attended Alcoholics Anonymous (AA) meetings,

-3-                                                                          *1632*

and maintained their sobriety. Both parents completed in-patient treatment at Old Minto Recovery Camp, an Athabascan substance abuse program designed for Alaska Native families. After undergoing treatment at Old Minto, Parker was able to maintain sobriety for 17 months, his longest period of sobriety since he was 17 years old. Cristi maintained sobriety for five months after the program.

OCS returned the children to Parker and Cristi for a trial home visit from April 2014 through October 2014. During the visit OCS apparently continued to offer services and the parents apparently remained sober. However OCS was concerned about the parents' ability to meet Jessa's special needs, and the OCS case worker at the time wanted to work with the parents to increase their level of parenting. The visit was terminated and the children were again removed after the parents violated the in-home safety plan by allowing their adult son, who had abused the children's older sister, to be present in the home with the children. The parents "didn't really agree with it" and "didn't understand the severity of the situation."

### C. Neuropsychological Assessments

Two months after the failed trial home visit, OCS case worker Eryne Hughes took over the case and arranged neuropsychological assessments for the parents so that OCS could understand why the trial home visit failed and how services could be modified to achieve reunification. Around that time both parents also relapsed, drinking on at least two occasions between November 2014 and January 2015 and failing a random urinalysis test (UA) in December 2014. On one occasion the parents went to a hotel where Parker " 'stayed drunk for two days' after having an argument with his roommates."

Dr. Heather Russell conducted the assessments in February and March 2015. She concluded that mental health, cognition, and personality disorders all contributed to Parker's and Cristi's parenting difficulties. As to mental health,

Dr. Russell diagnosed both parents with alcohol abuse and Cristi with major depression. As to cognition, testing showed both parents had great difficulty with verbal communication, requiring visual presentation of information. Dr. Russell described Parker as having "compromised language capacity," and Cristi's language functioning was significantly impaired, which Dr. Russell attributed to a possible auditory processing disorder. Dr. Russell observed "significant variability between [Cristi's] verbal and nonverbal reasoning abilities" and characterized Cristi as having "limited neurocognitive abilities."

Dr. Russell was also concerned about the parents' personality disorders. Parker was diagnosed with narcissistic personality disorder with sadistic and negativistic features, so he was "not likely to see himself at fault" or accept qualified professional opinions that his children required "intense supervision and structure" to ensure their safety. Cristi was diagnosed with paranoid personality disorder with depressive, dependent, and avoidant personality traits, and she harbored an "intense suspiciousness of the motives of others . . . even those in a helping role." Dr. Russell explained that it "would take an extraordinary amount of time" before Parker or Cristi could safely parent, as effective treatment for these disorders required introspection and a "willingness to acknowledge your own shortcomings" that was not then present in either parent. She observed that both parents had been "given ample opportunity to demonstrate change" and had been provided with services and support from state and tribal agencies for the past 15 years.

Dr. Russell ultimately concluded that the children should not be reunified with either parent, but she provided several recommendations for addressing the parents' issues. First and most importantly, both parents needed to address their alcoholism, and Cristi needed to address her depression; in particular, Parker should be encouraged to return to the cultural treatment program at Old Minto and engage in a "culturally

centered after-care program[].'' Dr. Russell also recommended medication evaluations for both parents, especially Cristi, as short-term medication could help Cristi combat lethargy, depression, and anxiety that might otherwise cause her to postpone treatment. Finally, Dr. Russell suggested specific therapeutic techniques and provided advice to future therapists.

### D.  Post-Visit OCS Involvement

OCS case worker Hughes was assigned to the case from December 2014 through January 2016. During this period, the parents "relapsed a couple of times" and "were in and out of Anchorage," "[e]ither going to Bethel or going to another village, working here, working there," in places like a cannery. Hughes spoke with the parents by phone and tried to set up meetings, but the parents were inconsistent about attendance. The parents were similarly inconsistent about attending weekly visits to see their children at OCS, although they spoke with the children by phone and participated in the children's treatment. OCS case worker Tammy Strawn took over the case at the end of January 2016, two months before the termination trial, and she set up a check-in procedure to manage the children's disappointment when the parents missed a visit.

OCS offered services to the parents, but the parents did not follow through. The parents had been working with CITC for case management services, but according to Hughes, they "stopped working with CITC for their own reasons." Hughes made a referral to Southcentral Foundation for therapeutic services, but the parents did not complete the referral process. Hughes also made substance abuse assessment referrals to help the parents get back into treatment, but although she scheduled an appointment for the assessment with Cristi in her office, the parents missed the assessment. Hughes set up UAs, which were inconsistent — sometimes positive, sometimes negative, and oftentimes no shows — and at some point, she agreed with the parents that UAs were no longer necessary "because they'd come up positive." During her brief tenure on the case,

Strawn scheduled another substance abuse assessment, discussed a possible return to Old Minto, and resumed UAs. At the parents' request, Strawn also began the referral process for Healthy Families, a Bethel-based program providing "healthy parenting practices from a cultural perspective."

### E.    Termination Trial

OCS filed a termination petition in October 2015. The trial was held in March 2016 and lasted three hours. The court heard testimony from six witnesses: Hughes, Strawn, Dr. Russell, both parents, and the children's current foster parent. The court also admitted five exhibits: a November 2015 case plan, the two neuropsychological assessments from Dr. Russell, an assessment for Jessa, and an email from Hughes's predecessor on the case. Council representatives attended the first part of the hearing telephonically but did not examine any witnesses or provide a closing statement.

Hughes and Strawn testified about their work over the last 15 months of the case and their concerns that the parents minimized their children's special needs. For instance, the parents wanted to place the children with family in Pilot Station. But OCS concluded that Pilot Station did not offer services for the children's special needs. Hughes explained that the parents' insistence on placement in Pilot Station was "an example of them minimizing or not fully understanding the severity" of those needs. Similarly, both parents wanted to return to Old Minto for treatment and bring their children, as families in the program do. But when Strawn "tried to explain that that might not work for [Jessa]" because the program would disrupt her services, the parents "didn't hear me. They just heard that I was saying that she couldn't go and it was very upsetting to them."

Dr. Russell, qualified as an expert witness in the field of clinical psychology, discussed the neuropsychological assessments she had conducted the

previous year. Dr. Russell explained that both parents' alcoholism and personality disorders were lifelong conditions that would take "years of therapy" even if all recommended services were available and all recommendations were followed. She explained that the parents' alcoholism and Cristi's depression needed to be addressed before their personality disorders because the parents would need to be introspective, sober, and "not as depressed" to benefit from therapy. She testified that she was "not familiar with any particular cultural programs," but she had recommended Old Minto because Parker told her that such programs were most effective for him and that he "stayed sober longer following cultural traditional ways."

Dr. Russell also discussed the parents' cognitive impairments and limited understanding about Jessa's needs. Despite her attempts to explain fetal alcohol spectrum disorder, the parents said that Jessa would "grow out of it"; Dr. Russell thought this was due to the parents' "difficulty understanding the concept of brain damage." She agreed that to accommodate Cristi, it would be important to "explain things several different ways," that face-to-face visits would "definitely help," and that prospective service providers "would need to know" about Cristi's significant verbal impairments so that they would not "launch into a typical talk therapy approach." In response to the court's question, Dr. Russell opined that the parents were capable of attending an appointment if given a date and time.

Cristi's own testimony demonstrated her inability to articulate the children's needs. She said that Judah "probably needs our love" and Jessa "just want [sic] her mom and dad" and "she's delayed on her speech." Parker provided more insight; he said the children "want us to be sober and . . . well enough to take care of them." He also spoke about his Alaska Native heritage and how his culture influenced his parenting and way of thinking. For instance, teaching was hands on, not verbal; the elders "wouldn't tell you, they'd show you." He discussed how he had worked through

some of his past trauma at Old Minto: "I wasn't mentally stuck or physically stuck, I was able to go forward and deal with my past." When the court asked what he did at Old Minto, he explained that he performed chores like collecting and chopping wood, which "keeps us busy and keeps our mind focused on what we're doing . . . . I'm focused on what I'm supposed to be doing, taking care of myself mentally and spiritually, and it does quite help a lot."

The court heard closing statements from OCS, Cristi, Parker, and the guardian ad litem (GAL). Both OCS and the GAL argued for termination, and OCS sought a finding that the children were in need of aid under AS 47.10.011(10) (substance abuse) and (11) (emotional disturbance affecting parenting). Both parents asked the court to postpone the termination decision. Cristi argued that OCS had failed to accommodate her cognitive impairments and mental health. Parker asked to try Old Minto again.

In its oral findings the superior court stated that it would focus on the parents' alcohol abuse. Accordingly, the court found that the children had been subjected only to the conduct described in AS 47.10.011(10).[3] The court made the other requisite findings under ICWA without much comment, explaining that "whether the parents have done all that they can do with the efforts, with the recommendations that have been made, is really what is persuading the court's decision."

The court later issued a written order which elaborated on the findings. As to active efforts, the order identified Old Minto, opportunity for family contact, referrals to Southcentral Foundation, and, "most significantly, a trial home visit." The court

---

[3]    Under subsection 10, a child is in need of aid if "the [parent's] ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child." AS 47.10.011(10).

added that it had "considered the parents' level of engagement in services after this case began. Enough time has passed — more than four years — that these efforts have proved unsuccessful."

The parents appeal.

## III. STANDARD OF REVIEW

A superior court's "active efforts" finding under ICWA presents a mixed question of fact and law.[4] Factual findings are reviewed for clear error.[5] "We will find clear error only when a review of the entire record leaves us 'with a definite and firm conviction that the superior court has made a mistake.' "[6] But we review de novo whether the superior court's findings satisfy the requirements of ICWA.[7] Similarly, "[w]hether expert testimony presented at trial satisfies the requirements of ICWA is a legal question that we review de novo."[8]

## IV. DISCUSSION

The superior court must make five findings before terminating parental rights to an Indian child.[9] The parties do not dispute three of these findings.[10] But both

---

[4] *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010).

[5] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 961 (Alaska 2013).

[6] *David S. v. State, Dep't of Health & Soc. Servs.*, 270 P.3d 767, 774 (Alaska 2012) (quoting *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)).

[7] *Thea G.*, 291 P.3d at 961.

[8] *Id.* at 962.

[9] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*,
(continued...)

parents challenge the court's finding by clear and convincing evidence that active efforts were made to prevent the breakup of the Indian family.[11]  And Parker alone challenges Dr. Russell's qualification as an expert witness used to support the court's finding beyond a reasonable doubt that continued custody would result in serious harm to the children.[12]

A. **The Superior Court Did Not Err By Finding That OCS Made Active Efforts.**

Before terminating a parent's rights to an Indian child, the court must find by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[13]  This determination is made on a case-by-case basis.[14]  To demonstrate active efforts OCS must "take[] the client through the steps of the plan rather than requiring that the plan be performed on its own."[15]  "In order

---

[9]     (...continued)
212 P.3d 756, 760-71 (Alaska 2009).

[10]     The undisputed findings are that:  (1) the children are in need of aid under AS 47.10.011(10) (substance abuse); (2) the parents have not remedied the conduct or failed to remedy the conduct within a reasonable time; and (3) termination is in the best interests of the children.

[11]     *See* 25 U.S.C. § 1912(d).

[12]     *See* 25 U.S.C. § 1912(f).

[13]     25 U.S.C. § 1912(d); *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010).

[14]     *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001) (citing *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[15]     *Id.* at 602-03 (quoting *A.A.*, 982 P.2d at 261).

to [do this] in a way that will satisfy the active efforts requirement, OCS must reasonably tailor those steps to the client's individual capabilities."[16]

In determining the scope of OCS's active efforts duty, the superior court may consider the parent's "demonstrated lack of willingness to participate in treatment."[17] We "look to the State's involvement in its entirety," and a period of time without active efforts will not necessarily render the efforts inadequate.[18] "Our concern is not with whether the State's efforts were ideal, but whether they crossed the threshold between passive and active efforts."[19]

We conclude that OCS crossed the threshold here. In its written order the superior court listed OCS's efforts, noted that it had "considered the parents' level of engagement in services," and found that "enough time has passed . . . that these efforts have proved unsuccessful." The parents had struggled with alcohol for most of their lives; despite numerous treatment programs and over 15 years of "support, encouragement, treatment and additional services" from state and tribal agencies, they were unable to achieve long-term sobriety. During the first part of this three-and-a-half

---

[16] *Lucy J.*, 244 P.3d at 1116.

[17] *Id*. at 1114 (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

[18] *Maisy W.*, 175 P.3d at 1268.

[19] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011).

year proceeding, the parents engaged in case management support from CITC, parenting classes, AA meetings, and in-patient treatment at Old Minto.[20] Based on the parents' progress, OCS initiated a trial home visit, and the family was reunified for six months.

But after the visit was terminated due to a safety concern, the parents relapsed. During the last year and a half of this case, the parents stopped working with CITC, stopped attending AA meetings, failed and then stopped attending UAs, and missed an appointment for a substance abuse assessment that Hughes set up for the purpose of resuming treatment. They were inconsistent about contacting OCS and attending family visits with the children. They did not follow through with OCS's referral for therapeutic services at Southcentral Foundation. We apply our independent judgment to conclude that the superior court correctly applied ICWA, and we further conclude that the superior court did not clearly err when it found that OCS's efforts were unsuccessful.

Parker argues that OCS did not make active efforts because it did not try to place the children with extended family in Pilot Station.[21] Although we have

---

[20] Although Parker argues that the record is "almost silent" as to OCS's efforts during this period, we have previously concluded that "if a parent is already in treatment, 'additional [OCS] efforts [to secure that treatment] would have been superfluous.' " *Marina B. v. State, Office of Children's Servs.*, No. S-13022, 2009 WL 225711, at *8 (Alaska Jan. 28, 2009) (alterations in original) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)). The court did not err in finding that active efforts were made, even if OCS was not the sole source of those efforts.

[21] Parker's argument is primarily based on the 2015 Bureau of Indian Affairs Guidelines for ICWA proceedings; he claims that in making "active efforts," OCS must "use the available resources of the extended family." We have previously declined to consider the 2015 Guidelines as a basis for "overrul[ing] our longstanding precedent." *Kent K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-15708, 2016 WL 483254, at *4-5 (Feb. 3, 2016). The Guidelines have since been superseded
(continued...)

recognized that there may be situations where an early placement decision implicates active efforts, we have held that ICWA compliance with respect to placements is ordinarily not germane to the elements of termination.[22] Placement and reunification "must be analyzed separately" unless "a child's placement directly impacts a parent's ability to participate in remedial efforts."[23] Parker does not explain how placing the children in Anchorage impacted his ability to participate in remedial efforts, and we therefore find his argument on this point unpersuasive.[24]

Both parents also challenge OCS's failure to follow Dr. Russell's recommendations from the neuropsychological assessments. Parker argues that OCS should have arranged for him to attend Old Minto or another cultural treatment program during the year after the failed trial home visit. But the parents needed to undergo a substance abuse assessment before they could resume treatment, and despite several referrals and Hughes's effort in setting up an appointment, the parents did not follow

---

[21] (...continued)
by the new ICWA regulations, which Parker admits do not apply to the proceedings in this case. *See generally* 25 C.F.R. §§ 23.1-23.144 (2016).

[22] *David S. v. State, Dep't of Health & Soc. Servs.*, 270 P.3d 767, 779 (Alaska 2012).

[23] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 963 (Alaska 2013); *see also Roy S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 278 P.3d 886, 891 (Alaska 2012) (rejecting an active efforts challenge based on OCS's failure to place the child in an ICWA-compliant household where the placement decision did not affect the parent's "ability to participate in remedial efforts").

[24] Parker also argues that OCS's failure to place the children in Pilot Station creates a "problematic de facto prejudice against reunification . . . as Anchorage will always be the location of greater access to western therapy." While this concern is troubling, Hughes's undisputed testimony was that Pilot Station "didn't offer services, and it's really important that the children receive these services."

through. Both parents argue that OCS did not make active efforts to address medication, Cristi's depression, or therapeutic services. But the court found that OCS made referrals to Southcentral Foundation "which would have addressed medication reviews and counseling had the parents attended"; this finding was supported by Hughes's testimony. And Dr. Russell's expert opinion was that the parents needed to address their alcoholism and depression before they could address their personality disorders through therapy.

Cristi argues that OCS should have tailored its services and communication strategy to accommodate the disabilities identified by Dr. Russell. "In order to 'take[] the client through the steps of the plan for reunification' in a way that will satisfy the active efforts requirement, OCS must reasonably tailor those steps to the client's individual capabilities."[25] Based on the record the superior court could have found that OCS's efforts were reasonably tailored to the parents' capabilities.

With respect to services, Hughes's unchallenged testimony was that the parents needed to undergo a substance abuse assessment before they could resume treatment, and the parents missed the appointment that she scheduled for them. The court specifically asked Dr. Russell if the parents were capable of attending such an appointment and engaging in treatment if given a date and time, and Dr. Russell opined that they were. Although Dr. Russell had also recommended that Cristi engage in short-term medication to combat depression and anxiety that might cause her to postpone treatment, the court could have reasonably found from Dr. Russell's answer that Cristi was capable of attending that appointment despite her depression, and that no additional accommodation was required for this threshold step in the treatment process.

---

[25] *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1116 (Alaska 2010) (alteration in original) (quoting *Wilson W. v. State*, 185 P.3d 94, 101 (Alaska 2008)).

With respect to communication, Cristi argues that OCS needed to take special effort to ensure that she understood what was being said, use frequent face-to-face visits to aid in her understanding, and discuss her impairments with prospective service providers. But both Hughes and Strawn testified about OCS's attempts to explain their concerns to the parents, such as Hughes's concern that Pilot Station did not offer services for the children or Strawn's concern that Jessa's services would be disrupted if she were allowed to visit Old Minto; neither parent challenged the case workers' handling of these conversations.

Hughes's undisputed testimony was that she did try to set up face-to-face meetings, but "it was 50/50 if they would show up." She also testified that the parents "were in and out of Anchorage," which the court could have found would make face-to-face meetings difficult. And no evidence contradicted Hughes's testimony that the parents needed to set up their own consultation with their primary care provider, then meet with a behavioral consultant, and then meet with a clinician, before Hughes would have the opportunity to discuss Cristi's impairments with anyone at Southcentral Foundation. The superior court could have found that OCS's communication efforts reasonably accommodated Cristi's impairments.

**B.**     **The Superior Court Did Not Err By Relying On Dr. Russell's Testimony To Satisfy The Expert Witness Requirement Under ICWA.**

In a termination proceeding under ICWA, the court must find "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[26] This finding "requires proof that the parent's conduct

---

[26]     25 U.S.C. § 1912(f).

is unlikely to change and will likely cause serious harm to the child in the future."[27] We have held that the expert's qualifications "need not include familiarity with Native culture" when "the basis for termination is unrelated to Native culture and society and when any lack of familiarity with cultural mores will not influence the termination decision or implicate cultural bias in the termination proceeding."[28]

Parker challenges the court's finding based on Dr. Russell's qualifications. As an initial matter, OCS points out that Parker did not challenge this finding below and therefore plain error applies.[29] "Plain error exists 'where an obvious mistake has been made which creates a high likelihood that injustice has resulted.' "[30]

Parker argues that cultural familiarity is required in this case because Dr. Russell recognized that cultural treatment programs were important in addressing Parker's sobriety, but she testified that she was unfamiliar with these cultural treatment programs. But the superior court found that the children were in need of aid based on the parents' alcohol abuse. Although cultural treatment programs may have benefitted Parker, he presented little other evidence that the court's findings about his alcohol abuse were based on cultural misunderstandings or that cultural biases were implicated. Given that "[o]ur decisions indicate that, in general, cases involving issues of parental substance abuse do not implicate cultural mores,"[31] and given Parker's failure to challenge

---

[27]    *Thea G.*, 291 P.3d at 964 (citing *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 503 (Alaska 2009)).

[28]    *Id.* (quoting *Marcia V.*, 201 P.3d at 503).

[29]    *See Marcia V.*, 201 P.3d at 504.

[30]    *Id.* at 502 (quoting *Miller v. Sears*, 636 P.2d 1183, 1189 (Alaska 1981)).

[31]    *Thea G.*, 291 P.3d at 964.  We do not address whether the result would be
(continued...)

Dr. Russell's cultural qualifications at trial, we cannot conclude that the superior court committed plain error in relying on Dr. Russell's testimony to support its finding.

## V.    CONCLUSION

For the reasons explained above, we AFFIRM the superior court's termination of Parker's and Cristi's parental rights.

---

[31]    (...continued)
different under the guidance of the new ICWA regulations. *See* 25 C.F.R. § 23.122(a) ("A qualified expert . . . *should* be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe." (emphasis added)); Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,829-30 (June 14, 2016) ("[A] qualified expert witness should normally be required to have knowledge of Tribal social and cultural standards, [but] that may not be necessary if such knowledge is *plainly irrelevant* to the particular circumstances at issue in the proceeding." (emphasis added)); *see also id.* at 38,781 (discussing ICWA legislative history finding that the application of "[n]on-Indian socioeconomic values . . . [l]ayered together with cultural bias" had resulted in the "unequal and incongruent application of child-welfare standards," and noting as an example that "parental alcohol abuse was one of the most frequently advanced reasons for removing Indian children from their parents; however, in areas where Indians and non-Indians had similar rates of problem drinking, alcohol abuse was rarely used as grounds to remove children from non-Indian parents" (citing H.R. REP. NO. 95-1386, at 10 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7532)).