NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| DAPHNE O., | ) |
| | ) Supreme Court Nos. S-16960/16962 |
| Appellant, | ) (Consolidated) |
| | ) |
| v. | ) Superior Court No. 3PA-15-00188 CN |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) AND JUDGMENT[*] |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) No. 1761 – April 22, 2020 |
| Appellee. | ) |
| | ) |
| | ) |
| WILLIAM T., | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District at Palmer, Kari Kristiansen, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant Daphne O. J. Adam Bartlett, Anchorage, for

---

[*] Entered under Alaska Appellate Rule 214.

Appellant William T. Anna Jay, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices. Carney, Justice, concurring in part and dissenting in part.

## I. INTRODUCTION

The parents of an Indian child appeal the termination of their parental rights, arguing that the Office of Children's Services (OCS) failed to meet its active efforts burden and that the superior court's qualification of the expert witness required by the Indian Child Welfare Act (ICWA) was erroneous.[1] We previously remanded this case for supplemental findings on OCS's active efforts. And in light of our recent *Eva H. v. State, Department of Health & Social Services, Office of Children's Services*[2] decision, we also requested additional briefing from the parties on the question whether returning to the custody of either parent would likely cause the child serious emotional or physical damage.

The superior court held an evidentiary hearing, issued supplemental findings on OCS's active efforts, and reaffirmed the termination of parental rights. We now conclude that OCS narrowly met its active efforts burden, particularly in light of the parents' unwillingness to cooperate and to maintain regular contact with OCS. We also conclude that the superior court did not commit plain error by qualifying the ICWA

---

[1]     25 U.S.C. § 1912(f) (2018) (terminating parental rights to Indian child requires testimony of qualified expert witnesses that continued custody "is likely to result in serious emotional or physical damage to the child").

[2]     436 P.3d 1050, 1058 (Alaska 2019) (holding that ICWA expert must be able to draw connection between parental conduct and potential harm to child).

expert and thus did not commit clear error by determining that returning to the custody of either parent likely would cause the child serious emotional or physical damage.

## II. FACTS AND PROCEEDINGS

### A. Mabel's Early Life, December 2008 To September 2015

Daphne O. and William T.[3] are the biological parents of Mabel, an Indian child[4] born in 2008. Mabel does not have a parent-child relationship with either parent; she spent her first eight months in Daphne's care but subsequently was raised by her paternal grandparents, Emily and Ezra.

Emily and Ezra raised Mabel as if she were their daughter, and they obtained legal custody without contest in November 2011. William was introduced to Mabel as an uncle and had some contact with her. Daphne, who often was incarcerated, was called a family friend and saw Mabel only once or twice.

Mabel was subjected to significant trauma in Emily and Ezra's household; according to OCS reports, family members abused substances, Mabel was exposed to pornography, Emily often was intoxicated, and Emily often fought with Ezra and others. Mabel frequently was cared for by a family friend. Mabel displayed behavioral issues at school and later was diagnosed with post-traumatic stress disorder and reactive attachment disorder.

---

[3] We use pseudonyms to protect the family members' privacy.

[4] *See* 25 U.S.C. § 1903(4) (2018) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."). Mabel is an Indian child because William is affiliated with the Seldovia Village Tribe.

**B.  Removal And Adjudication, September 2015 To September 2016**

OCS removed Mabel from Emily and Ezra's home in September 2015 and placed her with a foster parent.[5]  Daphne, who was incarcerated, and William were notified.  The Seldovia Village Tribe consented to the non-ICWA placement.[6]

OCS created a case plan for Emily, Ezra, Daphne, and William in March 2016.  Emily and Ezra signed the case plan, but Daphne and William did not.  OCS was to assist Daphne by meeting with her at the correctional facility to get updates, but there is no record this ever occurred.  OCS was to assist William by providing appropriate referrals.  William was referred for urinalysis testing (UAs); he already had completed substance abuse treatment but never signed a release allowing OCS access to those records.

Daphne was released from the correctional facility in April.  Daphne and OCS dispute whether OCS contacted her in the following weeks.  Daphne had periodic phone contact with Mabel's therapist and foster parent to learn about Mabel, but OCS wanted Mabel to adjust to knowing Daphne was her mother through therapy before allowing visitation.  Daphne and Mabel first had contact in June, when Mabel's therapist facilitated a supervised telephone call.  The therapist later testified that although the call was uncomfortable, it was no more so than anticipated.  Mabel regressed a little after the call, but she grew more open to knowing Daphne.  According to the therapist, Mabel

---

[5]  *See* AS 47.10.080(c)(1) (authorizing court to commit child in need of aid to OCS custody for placement).

[6]  *See* AS 47.10.084(a) (imposing on OCS, when possessing legal custody of child in need of aid, "responsibility of . . . determin[ing] . . . where and with whom the child shall live"); 25 U.S.C. § 1915(b)(i)-(ii) (2018) (granting preference in foster care placement of Indian child under ICWA to "a member of the Indian child's extended family" or "a foster home licensed, approved, or specified by the Indian child's tribe").

"waxes and wanes" in her desire for more visits and a closer relationship with Daphne. Daphne remained in contact with Mabel's therapist after the call, but the therapist's office was not equipped to facilitate in-person visits. Later that month OCS referred Daphne for an integrated substance abuse and behavioral health assessment, and she began treatment in September.

OCS held a review meeting by at least mid-2016. William attended telephonically; according to OCS, he said he did not care where Mabel was placed and then hung up. OCS was unable to contact William after that meeting. Evidence at trial indicated William was in contact with his probation officer in early June, but after he failed to report as required an arrest warrant was issued; about a week later he turned himself in. William appears to have been intermittently incarcerated for probation violations, but he spent no extended time period without contacting his probation officer.

The superior court adjudicated Mabel a child in need of aid[7] in late June due to habitual parental use of an intoxicant.[8] OCS and Mabel's guardian ad litem (GAL) submitted predisposition reports for an August disposition hearing.[9] OCS indicated that Daphne was following her case plan but that contact with Mabel was "a slow process." The GAL expressed skepticism that Daphne and Mabel ever would have a parent-child

---

[7]     *See* CINA Rule 15 (outlining child in need of aid adjudication proceedings).

[8]     *See* AS 47.10.011(10) (providing court may find child to be in need of aid if "the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child").

[9]     *See* CINA Rule 15(f)(3) (requiring court to schedule disposition hearing and order predisposition report containing information needed for informed disposition); CINA Rule 17(c) (requiring court to find prior to entering disposition in case involving Indian child that active efforts complying with 25 U.S.C. § 1912(d) have been made).

relationship. Following the hearing the superior court committed Mabel to OCS custody and continued her placement with the foster parent.

### C. Termination Petition, September 2016 To November 2017

A September 2016 OCS report noted that Daphne continued to follow her case plan and that OCS was committed to giving Mabel a chance to know Daphne. OCS reported that Daphne and William had been referred for substance abuse assessments, parenting classes, random substance screenings, and mental health assessments. This report was submitted to the court in advance of a permanency hearing[10] later that month without supporting documentation; no other evidence in the record suggests William had a mental health evaluation. The GAL criticized OCS for continuing to attempt reunification, concluding that reunification was "just not viable" and recommending that the permanency goal be changed to adoption, that the court hold a settlement conference, and that OCS petition to terminate parental rights.

The superior court held a permanency hearing in late September. Daphne reiterated that she wanted visitation but was being respectful because OCS and the GAL said she needed to be introduced to Mabel slowly. Daphne and OCS agreed to settlement conferences to resolve visitation, and the court scheduled two dates. Upcoming settlement conferences notwithstanding, in November OCS changed the permanency goal from reunification to adoption.

OCS agreed at the first settlement conference to schedule two in-person visits for Daphne and Mabel before the second settlement conference. Pursuant to the settlement conference visitation agreement, OCS made referrals for supervised visitation in December. But Daphne then ceased communicating with OCS, and OCS was unable

---

[10]    *See* CINA Rule 17.2(a) (requiring hearing to establish permanency plan for child in OCS custody).

to contact her. An OCS caseworker later testified that she tried reaching Daphne by calling and sending text messages to various phone numbers, contacting Daphne's mother, and contacting Mabel's foster parent.

In January 2017 Daphne learned that Mabel had written her therapist a letter explaining she no longer wanted to see Daphne and wanted to be adopted. Daphne then told her attorney to tell OCS that she would relinquish her parental rights. She disengaged from her case plan and ended substance abuse treatment. In April she lost her housing. By May she was homeless, and she eventually began using drugs again. Daphne did not follow through with relinquishing her parental rights, and in late June OCS petitioned to terminate Daphne's and William's parental rights. Daphne met and moved in with a new boyfriend that summer, and in August she restarted treatment at a substance abuse center.

Daphne attended another permanency hearing in late September; OCS offered to set up UAs and instructed her to contact her caseworker. William did not attend, and his attorney noted that William had not been in contact. William seems to have been incarcerated for at least part of September and again in late October for about a month. A second case plan, unsigned and undated, was created after that hearing. Although the plan stated that Daphne should have supervised and telephonic visitation with Mabel, no visitation occurred.

**D.      Trial, November And December 2017**

The superior court held a termination trial over three days in November and December 2017.[11] William participated telephonically the first day; he did not participate the other two days.  Daphne was present all three days.

The primary OCS caseworker, Mabel's therapist, and William's probation officer testified for OCS; OCS also called Jaime Browning as an ICWA-required expert.[12]  Daphne's boyfriend, her sister, and a longtime family friend testified for Daphne.

Daphne's attorney declined to voir dire Browning before her testimony, but William's attorney did.  Browning testified to her qualifications.  She had a bachelor's degree and a master's degree in social work, but without a focus on Native Alaskan or

---

[11]      Under ICWA and relevant Alaska Child in Need of Aid (CINA) statutes and rules, parental rights to an Indian child may be terminated at trial only if OCS shows:

(1) by clear and convincing evidence that: (a) the child has been subjected to conduct or conditions enumerated in AS 47.10.011 (CINA Rule 18(c)(1)(A)); (b) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent (CINA Rule 18(c)(1)(A)(i) - (ii)); (c) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family (CINA Rule 18(c)(2)(B)); and

(2) beyond a reasonable doubt, including qualified expert testimony, that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child (CINA Rule 18(c)(4)); and

(3) by a preponderance of the evidence that the child's best interests would be served by termination of parental rights (CINA Rule 18(c)(3)).

[12]      *See* 25 U.S.C. § 1912(f) (2018) (providing that termination of parental rights of an Indian child must be supported by the testimony of a qualified expert witness); *see also* CINA Rule 18(c)(4)

Native American studies. She had worked at OCS for several years, first as a family services caseworker, then a year as a drug court caseworker, two years as a family services supervisor, a year as an ICWA supervisor, and finally a year and a half as an initial assessments supervisor. While working as an ICWA supervisor, Browning supervised a hundred open cases at any given time and previously had been qualified in superior court as a child safety expert. Browning estimated she had attended hundreds of hours of training related to Alaska Native cultures and child-rearing practices throughout her career. Browning left OCS to work as a private expert in ICWA cases.

The superior court qualified Browning as an expert in child safety and welfare without objection. Browning testified that she had reviewed the removal petition, March 2016 case plan, OCS predisposition report, GAL predisposition report, permanency hearing report, termination petition, and OCS caseworker's affidavit. Browning also stated that she had reviewed court dockets for cases involving Daphne and William and had contacted the Seldovia tribal representative to inquire whether their conduct reflected general practices of the Seldovia Tribe. Browning listened to Mabel's therapist's testimony and was briefly shown some of OCS's trial exhibits.

Browning testified that reintroduction of a parent in Mabel's life had "the potential to be severely harmful." Browning believed either parent would have to reintegrate slowly, consistently follow treatment recommendations, and stay involved in Mabel's life for six months to a year before reaching a home visit stage. Browning said that if Daphne established herself as a parent but then were to relapse and again become absent from Mabel's life, "there could be substantial emotional harm." Browning did not know whether reinitiating contact between Mabel and her parents would be more harmful than not allowing her a relationship with either parent; Browning stated that Mabel's therapist could better judge that.

## E. Termination And Appeal

The superior court issued written findings in January 2018 terminating both Daphne's and William's parental rights. Relevant to this appeal, the court found "by clear and convincing evidence that [OCS] made active efforts over the entirety of the case to provide remedial services and rehabilitative programs designed to prevent the breakup of this family."

The court supported its active efforts finding by listing the following steps OCS had taken. Emily, Ezra, Daphne, and William were provided written case plans. Daphne was asked to attend classes while incarcerated, and upon release she received referrals for a substance abuse assessment, random substance abuse screening, and mental health services. OCS provided a supervised visitation plan and encouraged contact with Mabel's foster parent and therapist. William initially participated in random drug screening and in visitation with Mabel, but OCS "lost contact with [William]" in June 2016. Daphne was "fully engaged" by September 2016, but by January 2017 OCS had "lost contact" with her. When she "reappeared in September of 2017, [OCS] set up urinalysis and hair follicle testing." OCS provided Mabel services to address her "medical, dental, and mental health" needs. OCS investigated relative placement requests and completed an adoption home study. OCS provided visitation with relatives and had organized supervised visits with Daphne "by January 2017." The court found that OCS's "visitation plan was reasonable and in [Mabel's] best interest."

Also relevant to this appeal, the superior court found "evidence beyond a reasonable doubt, including the testimony of Jaime Browning, a qualified expert pursuant to ICWA, that return of [Mabel] to either parent will likely result in serious

emotional or physical damage to the child."[13]  The court found that Mabel did not have an emotional attachment to either parent and that forcing her to return to either of them likely would cause her severe emotional harm.  The court also found that the parents had "not made sufficient progress in substance abuse treatment and Mabel would likely be subjected to an unstable, chaotic and dangerous life if returned to either parent."

Daphne and William separately appealed, each challenging the superior court's active efforts and serious damage determinations.  We consolidated the appeals.

## F.    Remand, Second Termination Order

We remanded the superior court's termination order, concluding that the court's "active efforts" findings were inadequate for appellate review.[14]  The court's factual findings regarding William gave us "no indication of what OCS did to assist [him] after it took custody of the child or to assist [him] in furtherance of his case plan."[15]  We found the court's findings regarding Daphne to be "wanting":  "[W]hat did OCS do to assist [her] with her plan other than giving it to her and making referrals?"[16]  We required the superior court to make supplemental active efforts findings, "with specific regard to the new federal regulations"[17] interpreting ICWA, as well as the Bureau of

---

[13]    *See* 25 U.S.C. § 1912(f) (2018); *see also* CINA Rule 18(c)(4).

[14]    *Daphne O. & William T. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Nos. S-16960/16962 (Alaska Supreme Court Order, Aug. 23, 2018).

[15]    *Id.*

[16]    *Id.*

[17]    25 C.F.R. § 23.120(a) (2019) ("Prior to . . . termination of parental rights, the court must conclude that active efforts have been made to prevent the breakup of the Indian family and that those efforts have been unsuccessful."); 25 C.F.R. § 23.120(b) ("Active efforts must be documented in detail in the record.").

Indian Affairs' December 2016 Guidelines for Implementing the Indian Child Welfare Act.[18]

The superior court held an evidentiary hearing in April 2019 to facilitate supplemental findings on OCS's active efforts. Only Daphne and the OCS caseworker testified; no supplemental documentary evidence was admitted. Based on the original evidence admitted at trial and on the testimony at the supplemental hearing, the court again terminated William's and Daphne's parental rights, finding "by clear and convincing evidence that OCS provided active efforts . . . and that those efforts were consistent with ICWA, associated federal regulations, the [BIA Guidelines], CINA Rule 18(c)(2)(B), and existing Alaska precedent."

The superior court's supplemental findings are organized in sections reflecting examples of conduct constituting active efforts suggested by the federal regulations.[19] For example, the court found that OCS "continually sought and gathered information and assessed the circumstances surrounding the family."[20] The court based this finding on OCS's initial actions investigating the family's situation, contacting the parents, and creating case plans, then involving the parents, attempting to maintain contact with them throughout the proceedings, and reevaluating the parents' needs when

---

[18] Bureau of Indian Affairs, United States Department of the Interior, Guidelines for Implementing the Indian Child Welfare Act (2016), available online at https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf.

[19] *See generally* 25 C.F.R. § 23.2. We found the superior court's organization of the supplemental findings a helpful guide.

[20] *See* 25 C.F.R. § 23.2(9).

they re-engaged.[21] Noting that active efforts "must be tailored to the case,"[22] the court listed examples of OCS "identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services,"[23] and "identifying community resources . . . and actively assisting the . . . parents . . . in utilizing those resources."[24] The court found that OCS identified services to address William's substance abuse, mental health, and lack of parenting skills; it incorporated his preferences for where he received services, set up appointments, and encouraged him to attend. But the court found that, despite OCS's efforts, William refused to submit UAs, provide information releases, or participate in the required assessments. The superior court found that OCS identified services to address Daphne's substance abuse, mental health, and lack of parenting skills; encouraged her to participate in counseling, and gave her a list of providers. Daphne engaged in services while she was incarcerated, and OCS updated her case plan after her release.

In the lengthiest section of its supplemental findings, the superior court found that OCS had "support[ed] regular visits with parents . . . consistent with the need to ensure the health, safety, and welfare of the child."[25]

The court found that OCS had informed William in September 2015 he could have supervised telephone contact with Mabel, that he successfully had one telephone visit, and that when he then failed to call as planned on multiple occasions

---

[21]     *See* 25 C.F.R. § 23.2(1).

[22]     *See* 25 C.F.R. § 23.2.

[23]     *See* 25 C.F.R. § 23.2(2).

[24]     *See* 25 C.F.R. § 23.2(8).

[25]     *See* 25 C.F.R. § 23.2(7).

from October 2015 to February 2016, OCS "attempted to create alternative ways to facilitate the call[s]." The court found that supervised visitation between William and Mabel took place on three occasions in October and November 2015; after Mabel then refused three times to participate in visitation, OCS "attempt[ed] to address Mabel's concerns and encourage her participation." The court found that William failed to appear for visits in March and April 2016 and that OCS could not contact him despite repeated attempts; OCS then canceled its referral. The court noted that despite OCS's efforts, William infrequently utilized visitation; he told OCS that he "did not care where Mabel was placed" and that he "wanted nothing to do with the child, which was a position he held when the child was born." The court found that "if OCS would have continued to make referrals for visits, those efforts would have be[en] futile based on [William's] noncompliance" because according to William's own statements, "he did not want reunification with [Mabel]."

The superior court further found that OCS sought supervised therapeutic contact between Daphne and Mabel. Following Daphne's release from incarceration in April 2016, OCS informed her "she could have open communication with [Mabel's] foster parent" and in June OCS contacted Mabel's therapist to discuss establishing therapeutic contact with Daphne. The court found that Mabel's therapist facilitated a supervised telephone call between Daphne and Mabel and that Daphne was "told that she would need to consistently contact and engage with [Mabel's] therapist and foster parent []to demonstrate her commitment to establishing a relationship with [Mabel] and to ensure that future contact would not harm [Mabel's] therapeutic progress in processing her family's dynamic[]." The court found that Daphne had called the foster parent "only once" from April to August 2016 and that she had been reminded of the importance of maintaining contact. The court found that OCS created a plan for Daphne in December

and sent a referral for supervised visitation; Daphne was "made aware of the referral," but despite Mabel's therapist's attempt and OCS's repeated efforts, Daphne could not be contacted from December 2016 until September 2017. The court noted "[Daphne's] refusal to take the steps necessary to introduce herself to [Mabel] in a therapeutic way (by calling the foster parent at least once a week and staying in contact with [Mabel's] therapist)." The court found that OCS nonetheless made a referral for in-person supervised visitation but that Daphne "removed herself from the case" and "refused to communicate with OCS." Finally, the court found that upon Daphne's "reemergence" in September 2017, "it was apparent" that Daphne was not receiving the treatment she needed and "might be actively using substances"; OCS therefore halted visitation efforts. The court found that Daphne failed to maintain regular contact with Mabel's foster parent and Mabel's therapist. Addressing Daphne's testimony that the calls were "unproductive," the court commented that calls "would not be unproductive for a parent who was truly interested in forming a relationship with [Mabel]." Noting that the one therapeutic phone call was "dismal," that despite OCS's willingness to attempt supervised in-person visitation Daphne "disappeared from the case," and that Daphne was unable to maintain sobriety and consistently engage, the court found that "[t]hough unsuccessful, active efforts were provided to [Daphne] in this case."

## G. Supplemental Appeal

We requested briefing on the superior court's supplemental findings about OCS's active efforts and expert witness qualification in light of our recent *Eva H.* decision.[26] William and Daphne responded, both arguing that the superior court's

---

[26]  *See Daphne O. & William T. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Nos. S-16960/16962 (Consolidated) (Alaska Supreme Court Order, (continued...)

supplemental findings that OCS made active efforts still were unsubstantiated. Daphne additionally reiterated her argument that the superior court committed plain error by qualifying Browning as an ICWA expert.

## III. STANDARD OF REVIEW

"Whether the state complied with the 'active efforts' requirement of [ICWA] is a mixed question of law and fact."[27] "We review . . . the superior court's findings for clear error, but we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA."[28] "In a [CINA] case, we will sustain the trial court's factual findings unless they are clearly erroneous . . . . [F]indings are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party leaves us with a definite and firm conviction that a mistake has been made."[29]

"[W]hether an expert's testimony presented at trial is sufficient pursuant to ICWA is a legal question, which we review de novo."[30] "A trial court's determination

---

[26] (...continued)
May 7, 2019) (citing *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050 (Alaska 2019)).

[27] *Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 550 (Alaska 2017) (alteration in original) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[28] *Sam M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 442 P.3d 731, 736 (Alaska 2019) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 526 (Alaska 2013)).

[29] *Marcia V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 201 P.3d 496, 502 (Alaska 2009) (footnote omitted).

[30] *Id.*

that a parent's continued custody of a child will likely result in the child suffering serious emotional or physical damage is a factual finding that we review for clear error."[31]

"We review issues not raised at trial only for plain error. Plain error exists 'where an obvious mistake has been made which creates a high likelihood that injustice has resulted.' "[32]

## IV.   DISCUSSION

### A.   The Superior Court Did Not Clearly Err By Finding, By Clear And Convincing Evidence, That Active Efforts Were Made To Prevent The Breakup Of The Indian Family.

ICWA requires that a "party seeking to effect a . . . termination of parental rights to[ ] an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[33] Federal regulations define active efforts as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[34] We employ a case-by-case approach to the active efforts inquiry because " 'no pat

---

[31]      *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013).

[32]      *Marcia V.*, 201 P.3d at 502 (citation omitted).

[33]      25 U.S.C. § 1912(d) (2018).

[34]      *Sam M. v. State, Dep't of Family & Youth Servs., Office of Children's Servs.*, 442 P.3d 731, 736 (Alaska 2019) (quoting 25 C.F.R. § 23.2 (2019)).

formula' exists for distinguishing between active and passive efforts."[35]  This analysis considers "[OCS's] involvement in its entirety."[36]

"[T]he active efforts requirement does not require perfection," but rather requires that the State's efforts "cross[] the threshold between passive and active efforts."[37]  "Generally, we will find that active efforts have been made where OCS 'takes the client through the steps of the plan for reunification . . .' but decline to find active efforts where 'OCS develops a case plan, but the client must develop his or her own resources towards bringing it to fruition.' "[38]

### 1.  William

When we remanded this case, we were troubled by the paucity of the superior court's findings regarding William.  We noted that the findings "g[a]ve us no indication of what OCS did to assist [William] after it took custody of [Mabel]."[39]  This concern was remedied by the superior court's supplemental findings.

---

[35]  *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)).

[36]  *Maisy W. v. State ex rel. Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008).

[37]  *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011).

[38]  *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010) (citations and alterations omitted) (quoting *Wilson W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008)).

[39]  *Daphne O. & William T. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Nos. S-16960/16962 (Consolidated) (Alaska Supreme Court Order, Aug. 23, 2018).

The court noted evidence that OCS provided William a case plan requiring him to participate in UAs, a substance abuse assessment, a mental health assessment, parenting classes, a therapeutic court program, and substance abuse treatment at a facility he chose. OCS made a referral for supervised visitation, which began successfully in October and November 2015. But William subsequently failed to appear at visitation, and despite various efforts at different times, such as contacting his attorney, his probation officer, and the substance abuse treatment facility, and sending letters, OCS was unable to contact him. William refused to submit to UAs or provide information release forms, never received his required assessments, and told OCS that he "did not care where [Mabel] was placed."

We repeatedly have held that a superior court "may consider 'a parent's demonstrated lack of willingness to participate in treatment' " as part of its active efforts determination.[40] In light of William's refusal to engage with any case plan requirements, including his failure to utilize visitation to establish a parent-child relationship with Mabel, OCS's efforts to provide him remedial services and opportunities for visitation are properly characterized as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[41]

William argues in his opening brief that OCS "push[ed him] away," causing him to become "frustrated and break[] off contact." We previously have held that although a parent's "frustration with the situation [may be] understandable," it has no bearing on OCS's active efforts if the parent "disengage[s] from OCS" and thereby

---

[40]    *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 534 (Alaska 2013) (quoting *Lucy J.*, 244 P.3d at 1114).

[41]    *See* 25 C.F.R. § 23.2 (2019).

"stall[s] the progress that [the parent] could have made" toward reunification.[42] Because William refused to take advantage of the opportunities OCS provided for remedial services and visitation, we hold that the superior court did not clearly err by finding that OCS had met its active efforts burden with respect to William.

### 2.	Daphne

When we remanded this case, we also were troubled by the superior court's findings regarding OCS's active efforts to assist Daphne.[43] We asked: "What did OCS do to assist the mother with her plan other than giving it to her and making referrals?"[44] This concern was remedied by the court's supplemental findings. The court's findings demonstrate that OCS's efforts, although far from perfect, were sufficiently active to permit us to affirm the court's parental rights termination.

The superior court's findings show that OCS required Daphne to participate in UAs, a substance abuse assessment, mental health treatment, and parenting classes; OCS noted her engagement in services while she was incarcerated and updated her case plan after her release; and OCS made referrals for a substance abuse assessment and UAs. The court also found that in mid-December 2016, OCS lost contact with Daphne, and that despite OCS's repeated, consistent, and varied attempts to contact her, she refused to communicate with OCS again until September 2017.

The superior court found that after Daphne's April 2016 release from incarceration OCS allowed her "open communication with [Mabel's] foster parent," and

---

[42]	*Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 107 (Alaska 2017).

[43]	*Daphne O. & William T. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Nos. S-16960/16962 (Alaska Supreme Court Order, Aug. 23, 2018)

[44]	*Id.*

that "OCS contacted [Mabel's] therapist to determine [Mabel's] progress and the status of establishing therapeutic contact with [Daphne]." The court noted that Mabel's therapist facilitated a supervised telephone call between Daphne and Mabel; Daphne was "told that she would need to consistently contact and engage with Mabel's therapist and foster parent []to demonstrate her commitment to establishing a relationship with [Mabel] and to ensure that future contact would not harm [Mabel's] therapeutic progress in processing her family's dynamic[]." But the court found that Daphne had called Mabel's foster parent "only once" between April and August, despite being reminded that she "could have open communication" with the foster parent and that contact with Mabel's foster parent and therapist was important. The court found that in December OCS created a contact plan for Daphne and sent a referral for supervised visitation; Daphne was "made aware of the referral," but she nonetheless disengaged and refused to communicate with OCS.[45]

---

[45] At the supplemental hearing the OCS caseworker testified that from December 2016 to September 2017 she repeatedly attempted to contact Daphne; the caseworker called and sent text messages to different numbers she had for Daphne, called Daphne's mother, and called Mabel's foster parent. Daphne testified that during that time the OCS caseworker never contacted her, that she had the same working phone number throughout the proceedings, and that she never missed a call or received a voicemail. The OCS caseworker testified that visitation referrals were made for Daphne, although no visitation took place. Daphne repeatedly testified that she never was referred for visitation. No documentary evidence supports either version of events, but the caseworker's testimony supports the court's findings. *See Caitlyn E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 399 P.3d 646, 656 (Alaska 2017) ("[I]t was not error for the superior court to credit OCS caseworkers' sworn testimony about the extent of services provided . . . without requiring additional documentation."); *cf.* Alaska R. Civ. P. 52(a) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."); *Pam R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 185 P.3d 67, 71 (Alaska 2008) ("When reviewing factual findings we

(continued...)

Daphne's primary appeal argument is that OCS's efforts as a whole cannot be construed as "active" under ICWA and its regulations because OCS failed to provide any in-person visits with Mabel.[46]

It is true that OCS's efforts were not "active" at certain times. For example, while Daphne was incarcerated OCS appears to have done little more than note services available at the correctional facility. OCS said it would meet with Daphne for progress updates, but there is no record of any such meetings taking place. But active efforts are not measured by isolated time periods; we instead look at the entirety of a case,[47] and a parent's incarceration is directly relevant to OCS's ability to provide services.[48]

Following Daphne's release, OCS's efforts largely were active. The superior court found that Daphne "received referrals for substance abuse assessments,

<hr>

[45] (...continued) ordinarily will not overturn a trial court's finding based on conflicting evidence, and we will not reweigh evidence when the record provides clear support for the trial court's ruling." (citation omitted)).

We are not left with a "definite and firm conviction that a mistake has been made," with respect to the court's findings about OCS making visitation referrals or attempting to contact Daphne. *See Marcia V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 201 P.3d 496, 502 (Alaska 2009).

[46] *Cf. Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 551 (Alaska 2017) ("[A] parent of a child in OCS custody retains 'residual rights' unless and until all parental rights are terminated; these residual rights include 'the right and responsibility of reasonable visitation.' " (quoting AS 47.10.084(c))).

[47] *See Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763-64 (Alaska 2009) (explaining that active efforts are viewed over entirety of OCS involvement and periods of failure do not render efforts inactive).

[48] *See id.* at 763 (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261-62 (Alaska 1999)).

random substance screenings, mental health services, and a plan for supervised visitation as recommend by [Mabel's] therapist." The record indicates that Daphne had made substantial progress on her case plan in the months following her release from incarceration. The court found that Daphne "was afforded direct contact with Mabel's therapist and foster parent for updates and information." The superior court found that Daphne was instructed to maintain contact with Mabel's foster parent and therapist, but, despite numerous reminders, Daphne contacted Mabel's foster parent only once. Mabel's therapist was helping Mabel understand that Daphne was her biological mother — a crucial step toward visitation and reunification, given that Mabel and Daphne had no prior parent-child relationship — and requiring Daphne to maintain contact was a reasonable condition for that visitation.

As noted with respect to William, we consider a parent's refusal to engage when determining whether OCS met its active efforts burden.[49] Considered "over the entirety of the case"[50] and in light of Daphne's "refusal to engage"[51] with OCS — both by failing to maintain regular contact with Mabel's therapist and foster parent, and by disengaging entirely from the case and refusing to communicate with OCS for a period of approximately seven months — OCS's efforts on the whole qualify as "affirmative,

---

[49] *See Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 531 (Alaska 2013).

[50] *Jon S.*, 212 P.3d at 764; *see also E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989-91 (Alaska 2002) (holding that during many years of agency's involvement with ICWA parent who failed to get substance abuse treatment and did not communicate or cooperate, seven-month failure did not preclude active efforts finding).

[51] *Philip J.*, 314 P.3d at 531.

active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[52]

**B.     The Superior Court Did Not Clearly Err By Finding Continued Custody Likely Would Result In Serious Emotional Or Physical Damage.**

ICWA provides that a termination of parental rights must include a determination beyond a reasonable doubt, supported by evidence "including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[53]  An expert qualified by virtue of education or expertise must have specialized expertise "beyond the normal social worker qualifications."[54]  New federal regulations promulgated in 2016 clarify that the evidence must show "a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the particular child."[55]  Our recent *Eva H.* decision applied the new regulations and overruled a superior court's expert witness qualification determination because the expert "drew no connections between specific conduct and the likelihood of specific harm."[56]

---

[52]     *Sam M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 442 P.3d 731, 736 (Alaska 2019) (quoting 25 C.F.R. § 23.2 (2019)).

[53]     25 U.S.C. § 1912(f) (2018); *see also* CINA Rule 18(c)(4).

[54]     *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1054-55 (Alaska 2019) (quoting 2016 Guidelines, *supra* note 18, at 55).

[55]     25 C.F.R. § 23.121(c) (2019).

[56]     436 P.3d at 1057.

We review for plain error arguments made on appeal that were not raised at trial.[57] Consequently, when a parent challenges a superior court's qualification of an ICWA expert for the first time on appeal, we review only to determine whether "an obvious mistake has been made which creates a high likelihood that injustice has resulted."[58] In *Marcia V. v. State, Department of Health & Social Services, Office of Children's Services* we upheld a court's qualification of an OCS caseworker as an ICWA expert after the parent failed to object to the qualification at trial, even though the expert's only formal qualifications included a bachelor of science in Administration of Justice and seven years of OCS experience.[59] We held that although "it require[d] further inferences to conclude that [the expert] ha[d] expertise beyond that of a normal social worker, or that she ha[d] substantial education" relevant to the specific risk of harm at issue, "it was possible" to make those inferences and therefore not plain error to qualify her as an ICWA expert.[60]

---

[57]     *See, e.g.*, *Marcia V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 201 P.3d 496, 502 (Alaska 2009).

[58]     *Id.* (quoting *Miller v. Sears*, 636 P.2d 1183, 1189 (Alaska 1981)).

[59]     *Id.* at 504-05.

[60]     *Id.* at 505; *see also Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1119 (Alaska 2010) (upholding qualification of OCS supervisor even though it was "not clear" expert had "expertise beyond the normal social worker qualifications," but "it was possible to infer from the expert's [known qualifications] that she possessed the qualifications necessary under ICWA," and trial court's reliance on her expert testimony therefore was not plain error (quoting *Marcia V.*, 201 P.3d at 504, 505)).

The superior court qualified Browning as an expert in child safety and welfare without objection at trial.[61] Browning holds a master's degree; has substantial training in child welfare, including several trainings related specifically to Alaska Natives; and has ten years of experience working for OCS. Based on these qualifications, we conclude that it was not plain error for the superior court to rely on Browning's expert testimony. We previously upheld a superior court's reliance on an ICWA expert's testimony — over the parent's timely objection at trial — when the expert had a master's degree, was a licensed master's level social worker, had substantial training related specifically to Alaska Natives and substance abuse, and had ten years' experience at OCS.[62] We need not decide whether Browning's qualifications definitively suggest a level of expertise "beyond the normal social worker qualifications."[63] To the extent that conclusion "requires further inferences,"[64] those inferences can be readily drawn. In *Eva H.* we reversed a superior court's termination order when the court relied

---

[61]  William argued during closing that Browning did not have sufficient qualifications under ICWA. Our previous cases indicate that to preserve an argument for appeal, a party must raise an evidentiary objection at trial when the opposing party will have an opportunity to respond by proffering additional evidence. *See, e.g.*, *Lucy J.*, 244 P.3d at 1118 ("Because the qualifications of the experts . . . were not challenged *at trial*, we review such qualifications only for plain error." (emphasis added)). William's objection during closing arguments was not timely; therefore, the superior court's qualification of Browning as an ICWA expert is reviewed for plain error.

[62]  *See Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 171-72 (Alaska 2015); *see also In re Candace A.*, 332 P.3d 578, 586 (Alaska 2014) (upholding qualification of two ICWA experts who had master's degrees, internships in relevant subject areas, agency training, continuing professional education, and over ten years' experience each).

[63]  *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1055 (Alaska 2019) (quoting 2016 Guidelines, *supra* note 18, at 55).

[64]  *Marcia V.*, 201 P.3d at 505.

on a witness who was not qualified under ICWA to testify as an expert and who "drew no connections between specific conduct and the likelihood of specific harm" to the child.[65]  In contrast, Browning testified within her expertise to the connection between Daphne's and William's specific conduct and the likelihood of specific harm:  the risk the parents would relapse into substance abuse and the child's trauma resulting from the sudden absence of a caretaker.[66]

William separately argues that the superior court clearly erred in its determination that his continued custody would result in serious damage to Mabel because OCS failed to show that William would not place Mabel with a safe caregiver. William appears to contend that the court failed to make a determination that returning Mabel to William's *legal* custody would result in serious physical or emotional damage to Mabel.[67]  In its termination order, however, the court credited Browning's testimony

---

[65]    436 P.3d at 1057-58 (concluding  witness who "had no formal training in social work, psychology, or counseling, and . . . no professional tools . . . for recognizing mental health issues" was not "qualified under ICWA to testify as an expert about . . . whether returning the children to [the parents'] care was 'likely to result in serious emotional or physical damage'").

[66]    Daphne argues that the superior court relied "solely" on the issue of substance abuse in determining that returning Mabel to Daphne's custody would likely result in serious harm to Mabel.  This mischaracterizes the court's order; Daphne's substance abuse was only one of two reasons the court gave for why continued custody could result in serious damage.  The court's other, and overwhelming, concern was that the lack of a parent-child relationship rendered any return to Daphne non-viable.  This lack of attachment did not stem from Daphne's substance abuse; the court noted that Mabel "did not know [Daphne] and [William] as her parents," and "the parents were introduced to her once and subsequently re-abandoned her."  This conclusion was amply supported by the record, including by Browning's expert testimony.

[67]    ICWA defines "continued custody" as "physical custody *or* legal custody."  25 C.F.R. § 23.2 (2019) (emphasis added).

that Mabel "simply cannot tolerate a change in placement." The court also used language from Browning's expert report to make its serious damage finding, and Browning's expert report addressed precisely the situation William raises, noting that "if [Mabel] w[ere] returned to either parent, she would likely be placed with either the [grandparents] again or someone else who does not place M[abel's] best interests and safety as a priority." The court therefore appears to have credited Browning's view that William's legal custody would cause Mabel serious damage. Because the record supports that conclusion, we are not left with "a definite and firm conviction that a mistake has been made."[68]

## V. CONCLUSION

We AFFIRM the superior court's parental rights termination as to both parents.

---

[68] *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 399 P.3d 646, 654 (Alaska 2017) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

CARNEY, Justice, concurring in part and dissenting in part.

I agree that the superior court did not commit plain error by qualifying the ICWA expert, and that the court did not clearly err when it determined that returning Mabel to the custody of either parent would likely cause her serious emotional or physical damage. I also agree, based particularly on William's statement that he did not care where OCS placed his daughter and his failure to cooperate with either OCS or his probation officer and the therapeutic court,[1] that OCS very "narrowly" met its active efforts burden with respect to William.

But I do not agree that OCS made active efforts with respect to Daphne. It was clear error to conclude that Daphne's only contact with her daughter was "dismal" or that she had been informed that regular, sustained contact with the child's therapist and her foster parent was a condition of visitation. Because these errors formed the foundation for the court's determination that OCS made active efforts, I would vacate the termination of Daphne's parental rights.

## A.    Trial And Hearing Testimony

Our remand order specifically asked: "What did OCS do to assist [Daphne] with her plan other than giving it to her and making referrals?"[2] At the evidentiary hearing convened to answer our question, both the assigned OCS caseworker and Daphne again testified.

---

[1]    Therapeutic courts provide an intensive program designed to assist participants to successfully complete probation by providing counseling, treatment, and frequent monitoring by both a probation officer and the court. *See Palmer Wellness Felony Court*, ALASKA THERAPEUTIC COURTS, https://public.courts.alaska.gov/web/forms/docs/pub-118.pdf (last visited Apr. 6, 2020).

[2]    *Daphne O. & William T. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Nos. S-16960/16962 (Alaska Supreme Court Order, Aug. 23, 2018).

### 1. Caseworker's testimony

The caseworker's trial testimony had been notable for its lack of detail. When asked whether she had met with or placed a phone call to Daphne during the six months that Daphne was incarcerated, the caseworker responded "I don't believe so." When asked whether she sent Daphne any paperwork relating to her daughter, the caseworker could not "say for sure." The caseworker could not remember when Mabel began seeing her therapist, but the caseworker did "know that [Mabel] had a brief phone call with [Daphne] and the therapist" although she could not recall when that had occurred. And the caseworker testified that she emailed the therapist for status reports only every three months.

When questioned about efforts she had made to contact Daphne, the caseworker responded that although she had "lost contact" with Daphne, Daphne could have called OCS. The caseworker also asserted that Daphne "had opportunities to speak to [Mabel's] therapist as well as [Mabel's foster parent]." She described Daphne's lack of contact with the therapist as "concerning." At no point in her testimony did the caseworker mention a requirement that Daphne maintain a certain level of contact with Mabel's foster parent or therapist as a condition of visitation.

The caseworker's testimony on remand was far more specific than her previous testimony. She recalled that on June 9, 2016, she had an in-depth discussion with Daphne and explained the need for therapeutically-guided contact with Mabel; Daphne "was open to" such a plan. Regarding the need for Daphne to show her involvement with Mabel, the caseworker testified she "encouraged" Daphne to contact Mabel's foster parent and that she had "approved the foster parent to share photos of [Mabel] with [Daphne]." She believed that Daphne was "reminded by the guardian ad litem . . . about her responsibility in calling and making contact with the foster parent and with [Mabel's] therapist[]." But she did not testify that Daphne was expected to maintain

a particular level of contact with either the foster parent or therapist in order to obtain more visitation with Mabel.

The caseworker detailed the events between her June discussion with Daphne and when she "lost contact" with Daphne. She briefly described a September 2016 session between Daphne and Mabel's therapist "to talk about how to facilitate that therapeutic contact" with Mabel. She testified that she had mailed Daphne a letter in late October about an upcoming hearing in November, and left her a voicemail reminder.

She reported that Daphne contacted the foster parent a week after the hearing. She acknowledged that all parties except William participated in a court-ordered settlement conference on November 30, at which the parties agreed to arrange a supervised visit between Daphne and Mabel. But the caseworker reported that soon thereafter she became unable to make contact with Daphne. She detailed her efforts: "attempted to send her text messages"; "called various phone numbers"; "contacted her mother"; "contacted the foster parent"; and was "unable to contact . . . her via Facebook messages." The caseworker asserted that Daphne knew her cell phone number which had not changed and also knew Mabel's therapist's phone number, but did not call either of them. She believed that the therapist had attempted unsuccessfully to reach Daphne. And she concluded that as a result of her inability to reach Daphne and Daphne's failure to call her, there was no contact for nine or ten months.

When the caseworker was questioned specifically about the single phone call between Daphne and Mabel and how long it lasted, she replied, "I'd have to say 30 minutes is an estimate." Neither at the trial nor at the subsequent hearing did she offer an opinion about how the call had gone.

### 2. Daphne's testimony

Daphne's testimony at the evidentiary hearing, unlike the caseworker's, largely reiterated her trial testimony. At trial she testified that she was encouraged to call

the foster parent and Mabel's therapist and called each one "multiple times." She also acknowledged that she was told in court that she was allowed to have contact with the therapist and foster parent. She stated that, on the other hand, she had not had much contact with the assigned OCS caseworker. She described her efforts to try to reach the caseworker including going to the OCS office after her release from custody and leaving a message with her phone number when the caseworker was not available. She recalled having no contact with the caseworker except a few reminder calls before court hearings. Daphne testified that the caseworker "never sent me any emails, text messages" and that "she's not contacted me" even though Daphne had the same phone number from May 2, 2016, to August 25, 2017, and even though Daphne had provided the caseworker with additional contact numbers. She testified that she "never received a written notice about anything from [the caseworker]."

When asked about her phone call with Mabel, Daphne described it as "like a one minute conversation with her." She attributed the brevity to Mabel's shyness.

At the evidentiary hearing Daphne again testified that she had never received any mail from OCS and that the only calls she had ever received from the caseworker were reminder calls a few minutes before meetings. She stated that if she had received a voicemail, she would have returned the call. She reiterated that she had called Mabel's therapist and the foster parent "multiple times." And she described the phone call with Mabel as "[j]ust a few minutes." She again testified that she believed the call was short because Mabel was "bashful" and that because she had not been given much information about Mabel, the call was "just awkward."

### 3.     Therapist's testimony

Mabel's therapist testified at the trial; she was not called as a witness at the evidentiary hearing.[3] She described being asked to facilitate phone calls between Daphne and Mabel. After an initial attempt was unsuccessful because Mabel had not come to the therapist's office, a call was arranged for the end of June 2016. The therapist described the call:

> [I]t was probably — it was about a 10 minute phone call, 10 to 15 minute phone call. It seemed to go, I mean, okay. It was as — I don't want to say as uncomfortable as expected, but I mean, it was — it was very basic as [Mabel] at the time I believe was 7, and it was the first time with her talking to her biological mom. But overall, I mean, it seemed to go okay.

When asked whether she believed the call had been uncomfortable, the therapist answered that it was "but I would anticipate it to be uncomfortable for just about any kid." The therapist also testified about her therapeutic recommendation for telephonic visits as Mabel was introduced to Daphne, but that visits might be able to progress beyond that. She testified that after some months of therapy, Mabel was at a point where she was "stable enough for visits in some sort of controlled environment with [Daphne]." She explained that although she had initially participated in discussion about supervising an in-person visit, she determined that her office was not suitably equipped to handle such a visit.

At no point in her testimony, either on direct or cross examination, did the therapist state that she had explained to Daphne that she needed to contact her weekly for updates about Mabel's progress. Nor did the therapist testify that she had ever told

---

[3]     The court's supplemental order indicated that it was based on its original findings of fact and conclusions of law as well as the evidence presented at the evidentiary hearing on remand.

Daphne that maintaining such contact with her was required before Daphne could have visits with Mabel.

**B.    Supplemental Order**

When the superior court issued its Supplemental Findings and Conclusions of Law following the evidentiary hearing, it again concluded that active efforts were offered to Daphne. As was true of its initial order, the description of many of OCS's efforts lists passive ones: OCS "identified services to address . . . substance abuse, mental health, and lack of parenting skills"; "encouraged her participating in counseling and provided her with a list of providers"; "encouraged [Daphne] to call [Mabel's] foster parent and [Mabel's] therapist in order to move forward with visitation and to get updates on [Mabel]." The court noted that Daphne, in contrast, "submitted to mental health and substance abuse assessments and engaged in substance abuse treatment" and "allow[ed] OCS to monitor her progress in treatment."

The court also noted that OCS "exhaustively tried to locate and contact [Daphne], encouraged her to participate in services, encouraged her to maintain sobriety, and provided her necessary support. OCS was willing to modify its offered services to meet [Daphne's] needs . . . when her circumstances changed."

The court acknowledged that "OCS had to pursue therapeutic contact under the supervision of [Mabel's] therapist." Toward that end the court found that Daphne had been encouraged to call the foster parent and therapist "in order to move forward with visitation and to get updates on [Mabel]," and that "[Daphne's] failure to maintain regular contact with [Mabel's] foster parent and [Mabel's] therapist demonstrated her lack of interest in forming a relationship with [Mabel]." The superior court then described the phone call between Daphne and Mabel as "unsuccessful . . . because of [Daphne's] failure to maintain contact and the dismal nature of the one therapeutic phone call between [Daphne] and [Mabel]."

But no witness testified that the phone call was "dismal." The therapist, on whose therapeutic expertise the contact was based, stated that the call was "okay." Daphne described it as "awkward" because Mabel was "shy" and "bashful" due to not knowing Daphne. And the caseworker, who had limited information about the call, variously described it as "brief" or lasting "30 minutes," but offered no opinion about how the call went. The uncontroverted evidence before the superior court contradicts its description of the phone call as "dismal." Finding that the call was "dismal" was thus clear error.

That clear error is compounded by the court's finding that Daphne had been instructed that ongoing contact and communication with both Mabel's therapist and her foster parent were prerequisites to increased visitation. No such evidence was presented either at trial or during the evidentiary hearing following remand. Yet the court's two-paragraph conclusion that "[t]hough unsuccessful, active efforts were provided to [Daphne] in this case" is based almost exclusively on its beliefs that the phone call was "dismal," and its "dismal nature" was a result of Daphne's failure to comply with a required program of contacts with the foster parent and therapist.

The superior court's conclusion lacks evidentiary support. Neither the therapist nor the caseworker, either in her trial testimony or more detailed testimony at the evidentiary hearing, presented evidence that Daphne was told there was a connection between a minimum number of contacts with the foster parent and therapist and increased visits with Mabel, or that she had been instructed that a particular number of contacts was required. In the absence of any supporting evidence, it was clear error for the court to conclude that Daphne was aware of such a requirement and that she failed to comply with it.

Because the superior court's finding that OCS made active efforts to reunify Daphne with her daughter is unsupported by the evidence presented, I would vacate the termination of Daphne's parental rights.